ANDREW M. PARKER, plaintiff in error *vs.* THE FULTON LOAN AND BUILDING ASSOCIATION, defendant in error.

Where a suit to recover usury paid was brought against a Loan and Building Association, chartered by the Superior Court in favor of one who had been a member and borrower, and who failing to comply with the rules, as to the payment of his monthly dues, had, by way of settlement, conveyed to the company certain real estate at an agreed price in full discharge of his obligations and it appeared in proof that the company consisted of two thousand shares ; that $1 00 per month was to be paid upon each share until the accumulations should make each share worth $200 00 ; that the monthly receipts were to be used in advancing to the shareholders on their ultimate interest at such rates of premium as the money might bring at auction, and that each shareholder, taking an advance, was to pay $1 00 extra upon each share advanced upon, giving a real estate mortgage to secure the performance by him of his agreement to pay his dues as the constitution of the company required :

*Held,* 1. That the contract of a member taking an advance according to the rules, was not usurious *upon its face*, whatever might be the premium at which he agreed to take the advance.

2. Whether such a contract, though *legal* upon its face, was, in fact, illegal, would depend upon the object of the association. If it were, in truth, a mere devise to evade the usury laws, then it would be illegal, if in fact more was taken for the use of money than seven per cent. per annum. But if the organization were in fact and *bona fide* a plan with the real intent and object of "accumulating a fund by monthly subscriptions or savings of the members thereof, to assist them in procuring for themselves such real estate as they may deem proper," then it would not be illegal ; and this being a question of fact, depending

Parker vs. The Fulton Loan and Building Association.

upon evidence, it was proper for the Judge to leave it to the finding of the jury.

3. When no other facts appear to the jury, by the proof, going to show the object of such an association than the Constitution, and the contract made in accordance therewith, a verdict of the jury that the contract is not illegal, is not only supported by, but is required by the evidence.

4. If a contract claimed by one of the parties to be usurious and by the other not, is compromised and settled between them, the question of dispute as to the usury, forming a distinct item of the settlement, this is an accord and satisfaction even as to the usury, and the money paid cannot be recovered back, but a mere compromise and settlement of the debt without a distinct reference to the dispute as to the illegality of the contract is not a bar to a suit to recover back the usury paid.

5. This Court will reluctantly interfere with the discretion of the Judge below in his direction of the business of the Court, and never unless manifest injustice have come to the party complaining.

Loan and Building Associations. Usury. Accord and satisfaction. Practice. Before Judge HOPKINS. Fulton Superior Court. October Term, 1871.

Andrew M. Parker brought assumpsit against the Fulton Loan and Building Association, a corporate body incorporated by an order of the Superior Court of Fulton county, th declaration containing substantially the following allegations: That said Association is indebted to plaintiff in the sum of $4,605 75 as principal debt, with interest on the same from March 8th, 1868, for so much money by the said plaintiff paid, laid out and expended to and for the use of the said defendant, and at its special instance and request, the said sum of money having been paid to said defendant as usurious interest for the use of money over and above the legal rate of interest. The declaration contained a second count for $4,605 75 money had and received by the defendant for plaintiff's use.

The defendant pleaded the general issue, and that if plaintiff ever had any demand against said defendant, the same has been by accord and satisfaction, settled and adjusted between defendant and plaintiff, by the purchase of a certain house and lot by defendant from plaintiff at a price agreed

on between the parties, and on payment of the balance of $740 00 by defendant to plaintiff, all matters in dispute between them were by such accord settled and determined.

The following evidence was introduced upon the trial: Plaintiff testified that he joined the defendant, and took a few shares of stock. His object in joining was to borrow money from it, knowing that no one could borrow money without having stock to pledge as collateral. As he wished to borrow, from time to time, he got more stock through J. R. Wallace, sometimes paying him par and sometimes a little over par; told Wallace when he wished him to get him stock that he wished to buy it and borrow on it; at various times from September 13th, 1866, to March 8th, 1868, he got money from defendant; first got $190; bid it off at eighty-one per cent; the last gotten was $740 on a settlement in part payment for the land which he conveyed to defendant. He does not remember the dates nor amounts of the several separate loans received from defendant, but the total received by him amounted, in principal and legal interest on it to 8th of March, 1868, to something over $5,000, and paid them back various sums at dates and in amounts not remembered, aggregating, with legal interest added up to 8th March, 1868, to something over $9,000, leaving a balance over paid of $3,398. On said settlement defendant paid him $740 cash, and he conveyed to defendant property valued on the settlement at $6,500 in settlement of defendant's demands against him. The payments were in consideration of the money he had gotten from defendant.

*Cross-examined:* When he joined defendant, he was furnished with a printed copy of its constitution and by-laws, and a certificate of stock; each stockholder had to pay $1 00 per share per month on his stock, and a fine of ten cents for failure, whether such stockholder had borrowed or not, and $1 00 per share per month was paid by him to keep his stock; this stock was like any other stock so liable, on market, for fluctuating prices; when a loan was made, one dollar per month on each share bid off had to be paid for interest, and ten cents on this

Parker *vs.* The Fulton Loan and Building Association.

per month on failure to pay it; when payments were made, defendant's treasurer gave receipts showing the amount paid itemized. Plaintiff made up the account sued on from said receipts and other data in his possession; cannot remember any sums or the dates, except the first and the last, but knows that the aggregate is about as aforesaid; there is one error in said account, attached to the declaration of $1,200, in my favor, in one place, and some smaller and immaterial errors in calculations. Money kept up so high in the Association that, at any time within a year from the first borrowing by plaintiff, he could have paid back the identical sum received by him, and gotten his mortgages discharged, and had his stock reinstated, and gotten the accumulation on his stock; the money would thus have cost him no interest; at any time after that, he could have paid back what he had borrowed, *plus* such sum as, at the then rating rate of premium, would have made a mortgage by some other person equal to his, and gotten his mortgage released, and his stock pledged as collateral also released, and the accumulation on his stock would have exactly equaled the sum required by the Association to be paid in by him. This is not only so theoretically, but plaintiff knows it to be so practically. Had plaintiff kept his whole contract, he would have made, by the accumulation on stock, just what he would have lost by paying the installments required, but he had not the money with which to pay up according to his contract, and for that reason, lost by the contract. On the 8th of March, 1868, he had failed to pay, for five months, his monthly dues, then $200 per month; he then had a settlement with J. R. Wallace, who was acting for the company, and in that settlement all the items on the bill of particulars sued on were taken into consideration and passed upon. On that day, plaintiff agreed upon the settlement according to the paper exhibit. Defendant then bought plaintiff's stock, as therein shown, paid him $740 cash, and gave up all his mortgages and transferred his stock to defendant, and thus had a full settlement of all their affairs; but in that settlement nothing was said about usury,

but plaintiff knew what their claim was, and on what account their claim was, what he had gotten and what he had paid; had been a member of such an association before, and was familiar with all its operations.

*Re-direct:* Being unable to raise money to pay his monthly dues of $200 per month, for five months, and monthly fines of ten per cent. on the dues, and defendant threatening to sue him, he made said settlement to prevent suit. The average premium on all money borrowed by him was seventy-six per cent. Defendant began business in June, 1866. The amount of cash obtained depended on premium bid. Mortgage for any number of shares bid off was for $200 per share, without reference to the sum of money actually gotten. The amount procured was ascertained by deducting the price bid from $100 and doubling the remainder.

Here plaintiff closed.

Defendant introduced J. R. Wallace, who testified as follows: All the stock of the Association was taken the first night. Parker did get him to buy stock for him, and this he did as he bought other things on commission; he is a real estate dealer, purchaser and seller of stocks, etc. Defendant authorized him to settle with Parker, and he made the settlement; the basis of it was as shown by the paper shown him; it is signed by Parker. That settlement was in full of all difference between the parties. Defendant's board of directors had often discussed whether a borrower could successfully plead usury, and, while he is not certain, thinks he and plaintiff spoke of it before settling; he, acting for the company, thought the settlement covered usury, if there was any in the transaction. Nominally, the defendant held plaintiff's obligations for near $20,000, but plaintiff knew that that was but nominal, and that he was only required to pay his installments. Defendant was well posted about the operations of the Association. The real estate priced in the settlement at $6,500 was not then worth more than $5,000; the building on it was very inferior, and property was dull; it was then leased out, and there were

Parker *vs.* The Fulton Loan and Building Association.

some liens on it; Parker secured them against these liens by a mortgage on his Broad street property, and afterwards paid off the liens. About six months after the settlement, defendant sold said property for $6,500. Property had increased in value; has often seen a greater increase in six months in Atlanta. Defendant had paid $120 taxes on it, meanwhile. The paper shown was written by witness, except that Parker signed it. What plaintiff got, and what he had paid, witness did not know. Under the usual operations of such an association, it would reach the end contemplated, *i. e.*, when each share would be worth $200, less forty per cent., in sixty-six months from its organization.

Defendant then put in evidence said paper, which was as follows.:

"ATLANTA, March 17th, 1868.

"A. M. Parker, to Fulton Loan and Building Association:
One hundred shares at 65 per cent, 70.....................$7,000
Amount of dues supposed to be............................ 1,160

$8,160
Deduct stock............................................... 2,200

$5,960
Take front store, 21 by 100, now occupied, and possession to be given 1st June, 1868...................$6,500

$ 540
Allow him.................................................. 200

$ 740

"I will accept the above and make deed in fee simple to store-house and lot on Whitehall street, now occupied by F. Corra & Company.      (Signed)

"A. M. PARKER."

Defendant then put in evidence, by consent, its printed Constitution, as follows:

## "CONSTITUTION.

### "ARTICLE I.

"This Association shall be entitled The Fulton Loan and Building Association, and shall have for its object the accumulation of a fund by monthly subscriptions, or savings of the members thereof, to assist them in procuring for themselves such real estate as they may deem proper.

### "ARTICLE II.

"*Sec.* 1. Any white resident of Georgia, twenty-one years of age and upwards, may be a member of this Association. Married females and minors may hold property in this Association by trustee, and not otherwise; and the names of the person or persons for whom such property is held in trust shall be specified on the books of the Association.

"*Sec.* 2. Each stockholder, for each and every share by him or her held, shall pay the sum of one dollar, in par funds, on subscribing, and the same amount on the eighth (8th) day of each and every month thereafter, (unless such day occur on Sunday, in which event the payment to be made on the day previous,) to the treasurer, or to such other person or persons as shall from time to time, by the laws and regulations of the Association, be authorized to receive the same, until the whole stock shall be of sufficient value to divide to each share of stock the sum of $200.

"*Sec.* 3. When each stockholder, for each and every share of stock by him or her held, shall have received the sum of $200, then this Association shall determine and close: *Provided, always,* that any stockholder having received an advance in the manner prescribed in Article eighth, shall be debited in his account with the premium paid thereon.

"*Sec.* 4. Should any stockholder fail to meet his or her dues as often as the same shall be payable as aforesaid, he or she shall forfeit and pay the additional sum of ten cents for every such failure and for every dollar thus unpaid, the same to be charged with the monthly dues.

"*Sec.* 5. Should any stockholder neglect or refuse to pay

his or her monthly dues or fines for more than three months, he or she shall receive from the treasurer the amount of dues actually paid, with no allowance for interest thereon—first deducting all fines and arrearages with his or her proportionate part of any losses and expenses sustained—and thence cease to be a member of this Association.

"*Sec.* 6. Should any stockholder, not having received an advance, wish to withdraw from the Association, he or she shall be entitled to receive from the treasurer the amount of dues actually paid, first making the deductions provided for in the fifth section of this Article: *Provided, however,* that no stockholder wishing to withdraw give less than one month's notice to the directors of such intention. Transfer of stock may at any time be made in the presence of the treasurer, attested by his signature; but no such transfer shall be valid until all arrearages or fines that may be due upon said stock shall have been duly discharged. Such transfer must be made at least thirty days before an election to entitle the holder thereof to vote.

"*Sec.* 7. In the event of the death of a member who has not made a loan, the heirs or legal representatives of the deceased may continue his relation to the Association; or should they prefer it, shall be entitled, by giving the treasurer thirty days' notice, to receive from the Association the amount paid in, together with seven per cent. simple interest thereon from date of monthly payments; or should any such deceased member have made a loan and the note given to the Association be for an amount greater than that paid in by him to the Association in addition to seven (7) per cent. simple interest thereon, then the heirs or legal representatives may cancel the said note by paying its full value, less the amount paid in and interest as above stated; but if the note be for a less amount than that paid in and seven (7) per cent. simple interest thereon, then the heirs or legal representatives shall be entitled to receive from the Association the difference. In every instance of withdrawal by death, any charge there may be due for fines, arrearages, unpaid premi-

ums for insurance, and proportion of losses and expenses sustained, shall first be deducted.

"*Sec.* 8. No stockholder shall hold in his or her own right more than thirty (30) shares.

"*Sec.* 9. Each stockholder, for each and every share by him or her held, either in their own right or as trustee, shall be entitled, when personally present or by written proxy, at an annual election or special meeting, to one vote, for the election of officers and other purposes: *Provided, however,* that no stockholder shall be entitled to more than twenty votes on any one ballot, and be allowed one ballot only in any one election, or on any one question, for him or herself or as trustee for any other person.

"*Sec.* 10. Each member, upon subscribing for a share or shares, and making the first monthly payment of the same, shall be entitled to a certificate of such share or shares, specifying the number and amount thereof respectively, signed by the president and countersigned by the treasurer, which certificate shall be evidence of his title thereto.

"*Sec.* 11. Each stockholder shall sign this Constitution, thereby obligating himself or herself to pay punctually their monthly dues, interest and fines, and to fulfill all other requisitions herein contained.

"*Sec.* 12. The fines imposed by the fourth section of this Article shall be debited to the defaulting member until all arrears are paid.

## " ARTICLE III.

" The officers of this Association shall be a President, Treasurer, Secretary and four Directors, exclusive of the President, (who shall be *ex-officio* a member of the board,) all of whom must be stockholders.  They shall be elected at the annual meeting of the stockholders on the evening of the eighth day of June, 1866, and on the tenth day of June in each and every year thereafter ; provided that day do not occur on Sunday, in which case the election shall be held on the evening of the previous day.  A majority of all the votes represented, or present, shall determine an election.  Should

any officer die, or resign in the interim between one election and another, the board of directors shall have power to fill the vacancy.

## " ARTICLE IV.

" It shall be the duty of the president to preside at all meetings of the Association and of the board of directors ; to preserve order, and to sign all drafts on the treasurer when ordered by the board of directors, and to perform all other duties usually appertaining to his office. He shall have power, with the concurrence of two of the board of directors, to call a special meeting of the Association whenever he may deem it advisable.

## " ARTICLE V.

" *Sec.* 1. It shall be the duty of the treasurer to receive all moneys paid into the Association, and to pay all orders drawn upon him by authority of the board of directors, when signed by the president and countersigned by the secretary, and until the Association is made a body corporate by order of the Superior Court of Fulton county, or by act of the General Assembly of Georgia, all bonds, mortgages, policies of insurance, and other papers, shall be made to the treasurer as trustee for this Association, and upon the acceptance of such order or Act of Incorporation, all such bonds, mortgages, policies of insurance and other papers shall, *ipso facto,* vest in and, if necessary or proper, be assigned by him to said body corporate. Also to receive and hold in trust for the Association, all bonds, mortgages, policies of insurance, and other papers in connection with property upon which money is loaned, first giving his receipt therefor to the Secretary. It shall be his duty, and he is hereby empowered to give release and acquittance for all sums of money paid to the Association upon any note, bond, mortgage or other security, and, if necessary, acknowledge satisfaction of the same on record.   He shall keep accurate accounts with the stockholders and of all moneys paid into the Association.   His books shall be subject to the inspection of the board of directors, and he shall be prepared, at all times, to inform the members

of the state of their accounts, and, at the annual meeting, furnish a detailed statement of the finances of the Association. He shall give satisfactory bond for the faithful performance of his duties; shall receive such compensation for his services as the board of directors may determine, subject to the approval of the stockholders, and, at the expiration of his term of office, deliver over to his successor all moneys, books and papers in his possession belonging to the Association.

" *Sec.* 2. The treasurer shall deposit with the board of directors a correct duplicate of his receipt book, which he shall keep posted up every month so as to show all the receipts each month; and should the treasurer at any time refuse to exhibit any of the books or papers to any of the board of directors upon application, the board of directors shall dismiss him at once from office, and demand and receive from him all the books, papers and assets in his hands, and elect a successor to fill his unexpired term. Upon such dismissal, a refusal to deliver any of the books or assets of the Association shall be deemed and taken to be a full breach of the treasurer's bond.

## " ARTICLE VI.

"It shall be the duty of the secretary to keep correct minutes of the proceedings of this Association, and of the board of directors, and record the same in a book or books provided for that purpose. He shall attest all orders drawn on the treasurer for the payment of money, under the authority of the board of directors. He shall have charge of all books and papers belonging to the Association except such as are entrusted to the treasurer, and deliver up the same in good condition to his successor in office. He shall receive for his services such compensation as may be fixed upon by the board of directors and approved of by the stockholders.

## " ARTICLE VII.

" *Sec.* 1. It shall be the duty of one or more of the directors to meet statedly on the eighth evening of each and

and every month—at such place as the board may appoint—with the stockholders, to dispose of the funds of the Association according to the constitution, and to conduct the business of the Association generally.

"*Sec.* 2. They shall hold, on the fourth day after the monthly meeting, a special meeting, and other meetings as often as may be necessary, for the consideration of securities offered, and shall be empowered to appoint a solicitor for the Association, whose business it shall be to examine all titles, and draw up all papers in connection with said securities and attend to all other legal business of the Association. He shall be paid for his services such salary, out of the funds of the Association, as may be fixed upon by the directors and approved by the stockholders. In no case shall an order be drawn on the Treasurer for an appropriation until the necessary searches in the Courts of record shall have been made, and the solicitor certifies to the satisfactory character of the securities offered.

"*Sec.* 3. A majority of the board of directors shall constitute a quorum. They shall be empowered to fill all vacancies that may occur in their number, and to adopt any regulations for their government not disagreeing with this constitution.

"*Sec.* 4. They shall, from time to time, inspect the books and accounts kept by the treasurer, and shall cause a full statement of affairs of the Association to be annually prepared by that officer at least seven days before the annual meeting of the members, at which meeting such statement shall be submitted after having been first audited and signed by three members of the Association selected by the board.

"*Sec.* 5. Any order on the treasurer must be sanctioned by a majority of the board, and signed by the president and secretary.

"ARTICLE VIII.

"*Sec.* 1. Each stockholder, for each and every share of stock he or she may hold in the Association, shall be entitled to purchase an advance of stock of $200 and no more; pro-

vided, however, that no stockholder shall receive an advance of over $1,000 at any one monthly meeting, if any other stockholder present, not having received an advance, shall bid for it at an equal premium.

"*Sec.* 2. The amount paid into the treasury each month shall, at the monthly meeting of the stockholders, be sold to the highest bidder or bidders among them; provided the same be not sold under forty per cent. premium, and be secured by real estate fully equal in value to the net sum advanced. If there should at any time be no bid for the money as high as forty per cent., then the money shall be distributed by lot among those stockholders entitled to borrow under the rules of this association; and if the person upon whom the lot shall fall, shall fail, or neglect, or be unable to give security required, he shall pay interest on the money, according to the requirements of the constitution, until the next regular monthly meeting, when it shall again be distributed as above described—the name or names of the person or persons in default, as above mentioned, being left out of the lot until all the other members, entitled to an advance, shall have drawn.

"*Sec.* 3. Any stockholder taking an advance shall allow to be deducted the premium offered by him or her for the same, and shall secure the Association for such advance by satisfactory bond and mortgage, and policy of insurance, renewed from time to time at his or her expense. He or she shall further pay all recording fees, and all other expenses connected with such security, except the solicitor's fees.

"*Sec.* 4. For each advance of $200 made to a stockholder, one share of stock shall be assigned as collateral security. In case of failure to offer sufficient security for an advance within one month from the date of the purchase, the month's interest shall be charged to said purchaser, and his or her right to said purchase cease.

"*Sec.* 5. Any stockholder taking an advance shall pay to the treasurer, in addition to his or her monthly dues for shares, one dollar per month for each share on which such

advance is made, or at the rate of six per cent. per annum on the whole amount, including the premium.

"Sec. 6. No stockholder shall be entitled to an advance who is in arrears to the Association, and no property taken as security for an advance out of the limits of the county of Fulton, it being understood that the borrower shall pay all necessary expenses incurred by the directors in making an examination of all property out of the city of Atlanta.

"Sec. 7. Should any stockholder, having received any portion of his or her stock in advance, neglect or refuse to pay any or all of his or her dues to the Association for three successive months, then the directors may compel payment of principal and interest by instituting proceedings on the bond and mortgage, according to law. When any sale shall take place of any property mortgaged to the Association, the directors shall have power to retain and apply so much of the purchase money as would be required to redeem the property, pursuant to the provisions contained in the ninth article of this constitution, together with all other payments, moneys and expenses due to the Association, and shall pay the surplus thereof to the mortgagor.

"ARTICLE IX.

"Sec. 1. Should any stockholder, who has executed a mortgage to the Association, be desirous of selling the mortgaged property subject to the mortgage, he or she shall be at liberty to do so, with the consent of the directors, upon first duly transferring the shares secured by said mortgage to the intended purchaser, and upon such transfer being completed, and all arrears due the Association from the mortgagor being paid, and the conveyance to the purchaser being executed, such purchaser shall henceforth be liable to pay all monthly dues and interest payable in respect of such shares, and the directors may grant to the original mortgagor a release from all future liability in respect thereof.

"Sec. 2. It shall be lawful for any stockholder, having executed a mortgage in favor of the Association, to subsitute at his or her own expense, and subject to the approval of the di-

rectors any other property as security to the Association in lieu of that originally mortgaged.

"*Sec.* 3. Should any stockholder desire to have his or her property discharged from mortgage before the Association shall have regularly terminated, he or she shall be allowed so to do by paying into the hands of the treasurer such a sum of money as shall, at the rate of premium the funds are then selling, produce the same monthly payment of interest as that which said stockholder had been previously paying on his or her advance: *Provided*, that such sum shall in no case be less than the net amount actually received by him or her: *And provided further*, that no release shall be given until the money paid for such release shall have been sold, and the security offered for the same be approved by the directors, and the papers connected therewith duly executed; such stockholder paying all costs connected with the redemption of the mortgaged property.

#### "ARTICLE X.

"In addition to the fines mentioned in the fourth section of the second Article, any officer of the Association, for neglecting to attend any of the annual or special meetings, shall be fined for each and every such neglect, the sum of one dollar; nor shall any fine be remitted in any case other than sickness or absolute necessity.

#### "ARTICLE XI.

"This constitution can only be altered or amended at an annual meeting, and by a majority of the stock represented or present; and at least one month's notice of the proposed alteration must be publicly given.

#### "ARTICLE XII.

"The capital stock of this Association shall be not less than two nor more than three thousand shares."

The defendant then introduced the original mortgage and note, and transfer of stock given by plaintiff to defendant, dated 13th September, 1866, for the first sum borrowed by plaintiff of defendant, and, by consent of parties on the

Parker *vs.* The Fulton Loan and Building Association.

trial, it was admitted that all the other mortgages and notes and transfers given by plaintiff to defendant, for other sums obtained by plaintiff from defendant, contained precisely similar provisions, and differed from this one only as to dates and amounts. A copy of which mortgage, etc., is as follows:

"THE FULTON LOAN AND BUILDING ASSOCIATION.

"STATE OF GEORGIA—FULTON COUNTY.

"This Indenture, made this 13th day of September, in the year of our Lord, one thousand eight hundred and sixty-six, between Anderson M. Parker, of the first part, and N. R. Fowler, as treasurer, trustee for the members of the Fulton Loan and Building Association, his successors in office and assigns forever, of the second part, being of the county and State aforesaid, witnesseth : That whereas, the said party of the first part has, according to the constitution and by-laws of said Association, procured an advance and borrowed from said Association the full and just sum of $1,000, and therefore owes to said Association the said sum, with interest at the rate of six per cent. per annum, payable monthly ; and whereas, the said party of the first part is desirous to secure unto said Association the true and full payment of said debt and interest as aforesaid, in accordance with said constitution and by-laws of said Association. Now this indenture witnesseth, that the party of the first part, as well for the better securing to the party of the second part the faithful payment of the debt, which the said party of the first part justly owes to the party of the second part, in manner herein mentioned, as in consideration of the sum of five dollars to him in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, released and confirmed, and by these presents does grant, bargain, sell, alien, release and confirm unto the said party of the second part as treasurer, as trustee as aforesaid, his successors in office and assigns forever, all that city lot of land in the city of Atlanta, fronting on Broad street twenty-one feet, and running back seventy-five feet, bounded by

Healey's lot on the south, and by lot belonging to said Parker on the east, leased to B. N. Williford, north by lot belonging to said Parker, and fronting west on Broad street, together with all and singular the edifices, buildings, rights, members, hereditaments and appurtenances to the same belonging, or in any wise appertaining, and all the estate, right, title, interest, property, claim and demand whatsoever, in law or in equity, of the said party of the first part, of, in, or to the same; and the reversion and reversions, remainder and remainders thereof. To have and to hold the said premises hereby granted and released, with the rights, members, hereditaments and appurtenances thereunto, and every part and parcel thereof unto the said party of the second part, his successors in office and assigns forever, to the only proper use and behoof of the said party of the second part, his successors in office and assigns forever; upon condition, nevertheless, that if the said party of the first part, his heirs, executors, administrators or assigns, shall fully and faithfully pay to said party of the second part, his successors in office or assigns $1,000, according to the tenor and true intent and meaning of his certain promissory note, bearing even date with these presents, and duly made and executed by said party of the first part to the said party of the second part, payable on demand, according to the constitution and by-laws of said Association, with interest at the rate of six per cent. per annum, payable monthly, then this present indenture and the estate hereby granted, and every article and clause herein contained, as well as the said promissory note, shall cease and become utterly void. And it is hereby mutually covenanted and agreed between the parties to these presents, that if default shall be made in the payment of the principal, secured to be paid to the said party of the second part, whenever the same shall be demanded, according to the constitution and by-laws of said Association, and the interest which shall accrue thereupon, at any time or times on which they shall be due, or if any part of such principal or interest, that then and from thenceforth it shall be lawful for the party of the

Parker *vs.* The Fulton Loan and Building Association.

second part, his successors in office or assigns, to grant, bargain, sell and dispose of the said hereby granted premises, and all benefit and equity of redemption of the said party of the first part, his heirs, executors, administrators or assigns therein, according to the charter, by-laws, rules and regulations of said Association, rendering the overplus of the purchase moneys to be obtained for the same, after full satisfaction of the principal and interest to be due on such promissory note, in manner aforesaid, and the charges for advertisement and sale, and attorney's fees, cost of Court, and expenses of foreclosure, if any there shall be, unto the said party of the first part, his heirs, executors, administrators or assigns ; and the said party of the first part agrees to give such additional security for said loan, to the said party of the second part, as may be required, according to the constitution and by-laws of said Association ; and ................., the wife of the said party of the first part, hereby releases and relinquishes to the said party of the second part, all her right to dower that she now has or may hereafter have in and to the premises herein described and conveyed.

"In witness whereof, the said party of the first part hath hereunto set his hand and seal, on the day and year first above written.          (Signed)

                    A. M. PARKER, [L. S.]

Signed, sealed and delivered in presence of
     (Signed)     JOHN T. COOPER,
     (Signed)     DANIEL PITTMAN, Ordinary.
Canceled.
     (Signed)                    N. R. FOWLER, Treasurer.
Recorded September 2d, 1866.
     (Signed)                    W. R. VENABLE, Clerk."

Defendant introduced the original deed from plaintiff to defendant for the property agreed to be conveyed. It was dated 30th of March, 1868, the consideration therein expressed was $6,500, and the deed was in the usual form of fee-simple deeds.

Defendant then put in evidence a writing as follows :

"STATE OF GEORGIA—FULTON COUNTY.

" *To Noah R. Fowler, Treasurer of the Fulton Loan and Build-
ing Association, and to all whom it may concern:*

"This writing will witness that I, A. M. Parker, for and in
consideration of full value received, have transferred, assign-
ed and set over to the Fulton Loan and Building Association,
all the shares of stock I hold and control in the same, being
one hundred shares therein, and the said Noah R. Fowler,
treasurer as aforesaid, is hereby authorized and requested to
make such transfer, or cancel the same on the books of the
company, accordingly.

"Witness my hand and seal this, 30th day of March, 1868.
Mortgage on Broad street property to remain solely as collat-
eral security for covenant of warranty deed, this day given.
    (Signed.)                     A. M. PARKER."

In rebuttal, plaintiff testified as follows:

The matter of usury was not in controversy between plain-
tiff and defendant, at the time of said settlement in March,
1868, nor before. Nothing was said about usury then, or
before, to him, and the matter of usury was not covered by
that settlement. He had not demanded any deduction from
defendant's claims on the ground of usury. The written
proposition was the only one ever made by defendant to him
for a settlement, and contains all the matters settled. He
did not then know that he had any claim for usury against
defendant. He thought the settlement a hard one, but sup-
posed defendant had the advantage of him, and that he could
do no better. He had complained of the ambiguity of one
article of the constitution, by which a borrower upon settling,
as he was, met with harder terms than he might anticipate,
but yielded to defendant on that point.

His property was worth $6,500 and more, in cash, at the
time he conveyed it to defendant.

The jury returned a verdict for the defendant. Where-
upon plaintiff moved for a new trial upon the following
grounds, to-wit:

1st. Because the verdict of the jury is strongly and decidedly against the weight of the evidence and unsupported by the evidence.

2d. Because the verdict is contrary to law, equity and justice.

3d. Because the Court erred in refusing to allow plaintiff to show his pecuniary condition and monetary necessities at the time he obtained the money from defendant.

4th. Because the Court erred in refusing to allow plaintiff's counsel to place in the hands of plaintiff, when on the stand as a witness, the bill of particulars annexed to the declaration for the purpose of enabling plaintiff to refresh his memory as to the dates and amounts of the items thereof, after plaintiff had stated he could not, from mere memory, state the dates and amounts of most of said items.

5th. Because the Court erred in permitting J. R. Wallace when on the stand as a witness for defendant, over the objection of plaintiff, to testify as to the value of the real estate conveyed by plaintiff to defendant, in pursuance of the settlement of March the 8th, 1868, with the view of showing said real estate to have been worth less than the price agreed upon by the parties at the time.

6th. Because the Court erred in charging the jury " That the papers which have been submitted to you in this case do not show a usurious contract, but the contract, as shown by the papers, is not usurious. Look at all the circumstances and see if the contract, as shown by the papers, was made in good faith ; if so, the transaction is not usurious. If you should find that the contract was not an artifice resorted to for the purpose of concealing the true character of the transaction, then the plaintiff could not recover ; but if you believe the contract was an artifice or contrivance designed to conceal the true nature of the transaction, then plaintiff would be entitled to recover the usury paid."

7th. Because the Court erred in charging the jury thus: " If the contract was that plaintiff was to obtain money, and it was contemplated that in a certain contingency that might

arise, Parker might not have to pay more than principal and legal interest, then it is not usury; each took his chance."

8th. Because the Court erred in charging the jury thus: "If there had been transactions between the parties and they met together and, by agreement, plaintiff conveyed real estate to defendant for the purpose of paying defendant's demand, also to obtain, as part purchase money of the land, a further sum of money, which real estate defendant received in satisfaction of defendant's demand, and defendant paid to plaintiff the balance of the estimated value of the land in money, plaintiff could not recover in this action unless before suit commenced defendant had converted said land into money by sale."

9th. Because the Court erred in charging the jury thus: "If the jury find that there was an adjustment between the parties, mortgages and notes given up by defendant, and land conveyed by plaintiff in pursuance of that adjustment, and in that adjustment all the money paid by Parker was taken into consideration directly or indirectly, that ends the matter; whether it was called usury or not makes no difference, such would be an accord and satisfaction."

10th. Because the Court erred in refusing to charge the jury as requested in writing by plaintiff's counsel as follows, to-wit: "The subsequent taking of more than lawful interest is presumptive evidence of an original usurious contract."

11th. Because the Court erred in refusing to charge the jury as requested in writing by plaintiff's counsel as follows, to-wit: "There must be a usurious intention or there is no usury; but if one makes a bargain for more than legal interest, believing that he has a right to make such a bargain or that the law gives him all that he claims, this is a mistake of law and does not save the party from the effect of usury."

12th. Because the Court erred in refusing to charge the jury as requested, in writing, by plaintiff's counsel, as follows, to-wit: "If the jury believe, from the evidence, that plaintiff conveyed to defendant real estate in payment of the demand then held by defendant against plaintiff, and the said

Parker *vs.* The Fulton Loan and Building Association.

real estate was received as payment by defendant, then such payment would have the same effect in this case as if so much money had been paid and received."

13th. Because the Court erred in refusing to charge as requested by plaintiff's counsel, in writing, as follows, to-wit: "That the price of the real estate, so conveyed and received, which the parties placed upon it was binding upon them in this suit."

14th. Because the Court erred in refusing to give to the jury, as requested, in writing, by plaintiff's counsel, the following charge, to-wit: "A settlement does not necessarily amount to a compromise, nor to an accord and satisfaction; there may be a settlement without a compromise, or without accord and satisfaction."

15th. Because the Court erred in refusing to charge the jury as requested, in writing, by the counsel for plaintiff, as follows, to-wit: "To sustain the plea of accord and satisfaction in this case, it must appear from the evidence, to the satisfaction of the jury, that the matter of usury was in controversy between both plaintiff and defendant at the time of settlement, and that the same was taken in and actually settled between the parties, and that, in and by said settlement, some advantage, legal or equitable, enured to plaintiff. If the matter of usury was not, on the part of each party, intentionally settled and adjusted in said settlement, then such settlement is no accord and satisfaction of the plaintiff's claim for usury, sued for in this action."

16th. Because the Court erred in refusing to charge as requested, in writing, by plaintiff's counsel: "That there is no special form or expression necessary to constitute a usurious bargain. If the intention is, substantially, that one should loan his money to another, who shall therefor, in any manner whatever, pay to the lender more than legal interest, it is a case of usury."

17th. Because the Court erred in refusing to charge the jury, as requested, in writing, by plaintiff's counsel: "That if the jury should believe, from the evidence, that the con-

Parker *vs.* The Fulton Loan and Building Association.

tract between the parties was usurious, and that the matter of usury was not compromised in any settlement, then plaintiff would be entitled to recover the amount, whatever it is, which the evidence shows plaintiff paid defendant over and above the principal borrowed and legal interest thereon, to time of payment, with interest on said excess from the date of the payment of said excess."

18th. Because the Court erred in refusing to charge the jury as requested, in writing, by plaintiff's counsel: "That if the jury should believe, from the evidence, that, at the time of settlement, defendant's demand exceeded principal and lawful interest, and plaintiff settled with defendant without setting up any objection of usury or claim of usury, such settlement would not bar plaintiff from afterwards suing for and recovering the usury."

19th. Because the Court erred in putting a construction on the contract, and in charging the jury so, when the construction, under the facts of the case, was for the jury to decide, and not for the Court.

The motion for a new trial was overruled by the Court, and plaintiff excepted, and assigns said ruling as error upon each of the aforesaid grounds.

E. N. BROYLES; R. ARNOLD, for plaintiff in error. 1st. The Court erred in excluding the evidence offered by plaintiff, as to his pecuniary condition at the time of the loan: 9th Peters, 443, 453, 454. 2d. The Court erred in refusing to allow the plaintiff to testify from the bill of particulars: 1st Greenleaf's Evi., sec. 436; 24th Ga. R., 513. 3d. The Court erred in charging as set forth in the sixth ground of a new trial: 21st Ga. R., 620; 35th Penn. R., 470; 26th Ind. R., 269; 41st *Ib.*, R., 478; 33d Barb. R., 103; 25th Bark. R., 268; 6th Allen R., 116; 2d Cowen R., 705; Par. Mer. Law, sec. 255; 2d Par. on Notes and Bills, sec. 411; 3d Par. on Con., (5th Ed.,) 128; Chit. on Con., 704; Story on Con., sec. 597; 36th Barb. R., 585; 31st N. Y. R., 472. 4th. The charge, as set forth in the seventh ground of new trial,

Parker *vs.* The Fulton Loan and Building Association.

was error: 9th Peters' R., 448; Cowper, 77Q; 3d Par. on Con., (5th Ed.,) 139.   5th. The Court erred in charging as complained of in the eighth ground of new trial: 42d Ga. R., 455; 7th Cowen R., 662; 2d Wend. R., 481; 1st Ga. R.,154; 6th. The Court erred in charging as complained of in the 9th ground of new trial: 42 Ga. R., 455; Code, sec. 2829; 1 Hill R., 572; 9 Barb. R., 371; 2 Abb. N. Y. Digest, 426, 457; 8 N. Y. Digest, 23; 2 Par. on Con., 688.   7th. The Court erred in refusing to charge as set forth in 10th ground of motion for new trial: 2 Par. on Notes and Bills, 414; 11 N. Y. R., 368; 3 Par. on Con., (5th Ed.) 117; 2 Cowen R., 705; Parsons' Mer. Law, 257.   8th. The Court erred in refusing to charge as set forth in the 11th ground of the motion for new trial: 2 Cowen, 705; Parsons' Mer. L., 255; 2 Parsons on N. and B's., 411, 412; 3 Parsons' Cont's, 128, 129; Chit. on Cont's, 704, note (n.); Story on Cont's, sec. 597. 9th. Court erred in refusing to charge as shown in 12th ground of the motion for new trial: 42 Ga. R., 455 (2); 7 Cowen, 662; 2 Wend., 481; 1 Kelly, 154, 155.  10th. Court erred in not charging request stated in 14th ground in motion for new trial, to effect that settlement does not necessarily amount to accord and satisfaction, etc.:  See authorities to point 7th in this brief.   11th. The Court erred in refusing to charge as requested in 15th ground for new trial, as to accord and satisfaction: R. Code, 2829; 8 N. Y. Dig., 23 (1); 1 Hill, 572; 9 Barb., 371; 2 Abb. N. Y. Dig., 426, 457–8; 1 Bouv. Dic., Accord; 14 Barb., 607; 1 Abb. N. Y. Dig., 15 (38); Bacon Abr., Accord A; 2 Parsons on Cont's, (5th Ed.,) 686, 687; 7 Ga., 434–5.   12th. The Court erred in refusing to charge as requested in 16th ground in motion for new trial: 3 Parsons on Cont's, 107; Parsons' Mer. L., 254, 255; 2 Parsons' Notes and B's., 400; R. Code, 2024.  13th. Court erred in refusing to charge as specified in 17th ground for new trial.   14th. Court erred as stated in 18th ground for new trial: See authorities to point 11th in this brief. 15th. Court erred in putting a construction on the contract and in charging the jury so, as the construction was for the

jury, being a mixed question of law and fact: 9 Wal., 248, 201; 11 Wal., 394, 252; 10 Wal., 129; 12 Wal. R., 391; 21 How. R., 146; 11 Wheaton R., 75. 16th. The requests were legal and pertinent, and it was error in the Court to refuse so to charge: 37 Ga. R., 102; Harrison *vs.* Hatcher, decided Feb. 27th, 1872; 17 Ga. R., 204.

HILLYER & BROTHER; A. W. HAMMOND & SON, for defendant. 1st. The pecuniary condition of plaintiff was not relevant: Code, sec. 3703. 2d. Improper to have allowed plaintiff to testify from the bill of particulars: 18 Ga. R., 463; 1 Greenleaf Ev., sec. 431. 3d. The charge of the Court was substantially correct: 43 Ga. R., 529; 41 *Ib.*, 186; 15 *Ib.*, 241. 4th. The construction of the written contract was a question for the Court: Code, sec. 2712; Blydenburg on Usury, 85; 1 Wal. R., 625; 12 Fla. R., 552. 5th. Usury, if any, was settled by accord and satisfaction: 21 Ga. R., 592; 52 Barb. R., 581; Code, sec. 2594.

McCAY, Judge.

Was this contract usurious upon its face? Was the Court, construing the papers as they were presented, without other testimony, wrong in saying that the contract was not usurious in form? We think this contract on its face to be a mere sale by the plaintiff of his right to a share in the ultimate division of the accumulations. That is clearly the *form* of the contract. The plaintiff was the owner of stock or shares; they paid nothing, and were to pay nothing, until the accumulations amounted to a certain sum, when, as is the result of the provision for winding up, that sum was to be divided between such of the shareholders as had not sold. Having such shares, the plaintiff *sold* them to the company, the company advancing him a certain sum of money and he binding himself to do certain other things. That is clearly the *form* of the contract. It is not a loaning of money at all, nor is it forbearance for the use of money, but a sale of certain shares of stock in the company to the company. We do

not, at present, mean that beneath this form, apparently legal, there may not lurk a device for covering up usury; we only say that, upon the face of the contract, it is simply a sale of the plaintiff's stock to the company, at such a price as he saw fit to take and the company to give, and that is all. If there is usury, it is concealed, covered up; the contract does not indicate it. The plaintiff was a subscriber to the stock; he had paid in a portion of his assessments, and he agreed to sell out his stock, or, rather, to sell out to the company his interest in the final dividend.

It must be remembered that the evidence shows *two* contracts: one is the *taking* of the stock and the contract to pay for it, monthly, as stipulated; and the other is the *sale* of it. They were not cotemporaneous; one was complete without the other. The taking of the stock, and the obligations then assumed, were not dependent at all upon the sale. The plaintiff might or might not sell. Doubtless, some of the stockholders will not sell. It is not a part of the stock contract that they shall sell. It is at their option. The contract, as stockholder, is a separate, independent thing, complete in itself, and, with all its obligations, is prior to, and in no necessary way has anything to do with the subsequent contract of sale. A stockholder, who had paid ten monthly installments, might certainly have sold to a stranger—one who was not a stockholder—all his interest in the company, contracting, at the same time, that he would continue to pay the monthly installments, as they fell due, and, no matter how low the price, or at how great a sacrifice he sold, there would be nothing in the *form* of the contract to show usury. In other words, as the facts in the record show, the plaintiff subscribed for a certain number of shares in the stock of the company. By the terms of that subscription, he was to pay, monthly, on each share, a certain sum until the accumulations should reach a fixed figure, when the assets were to be divided among the stockholders then holding stock. There was no usury or illegality here, but only a simple subscription for stock, with the obligation to pay according to the terms of

the contract.   The subscriber becomes the owner of the stock as he would be the owner of any other stock subscribed for. Why may he not sell it as he may other stock, to a stranger or to the company, and contract that the purchaser shall have it, free from any liability to calls or monthly payments?   This is the stock contract, and it is a legal, natural contract on its face.

Having made this contract, the stockholder has his option to keep it or to sell it, to hold on for his final division, or to sell for what he may deem its present worth in cash, he contracting to keep the purchaser harmless from the demand for monthly payments.   This second contract, this sale, is purely optionary.   The stockholder may make it or not, and for this reason this contract of sale has no necessary connection with the subscription.   The contract of sale on his part is simply that he will pay $1,00 per share extra each month, and will comply with his original undertaking.   There is absolutely nothing in either of these two contracts, upon *the face of them*, that is usurious, and we see no error in the Court so holding.

Whether the scheme, taken as a whole, is or is not a device to avoid the usury laws, is a question of fact for the jury under the proof.   The Court so charged the jury, and the finding is in effect that it was not such a device.   We think the jury found rightly under the evidence.   As we have shown there is nothing in the form of the contract, nothing on its face, to make it usurious.   Was this form a mere trick or device by which to hide or cloak the real intent?

The object of the Association is, as expressed in the articles, to enable the members to acquire, by the payment of small sums monthly, houses and homes.   The whole affair is simply this: A certain number of persons agree among themselves that they will each advance, to make up a fund, a certain sum monthly; that each will bind himself to continue to make that monthly advance until the gross value of the whole fund shall amount to a certain agreed sum, when it shall be divided among those who have continued to pay and have not sold out their interest.   Having thus secured

Parker *vs*. The Fulton Loan and Building Association.

a monthly fund and arranged for its continuance, it is further agreed that at each monthly meeting the money on hand shall be employed in buying up the interest of any stockholder who may be willing to sell any of his stock, the seller continuing his regular monthly payments, and paying also, each month, one dollar for each share he has sold. *Whenever* the accumulation on hand—whether derived from regular monthly payments or from profits thus made by the purchase of the stock—reaches a certain per cent., the whole affair winds up. The monthly payments cease, and the money on hand is divided to the stockholders who remain. It must be added, also, that each stockholder, when he sells to the company his ultimate interest, still retains his right to vote and act as a member. Now, as we have said, there is nothing, either in the form or in the nature of the contract of subscription, or in the contract of sale, that is illegal. Both of them occur every day, and were the *sale* of the ultimate interest made to a stranger or to another member of the company, there would be no pretense of usury, however low the price. Can the fact that the sale is made to the company itself make any difference? If there is any difference it is only in this, that the seller is himself interested in the purchase, and continues, as we shall see, to be interested in every sale and purchase until the final winding up of the enterprise. What the stockholder agrees to pay for the money he gets when he takes money, is dependent on what he and others agree to take the money at. So soon as the accumulations reach a certain per centage—that is, will divide $200 to each stockholder—all payments stop and the concern winds up. If the money at each monthly meeting is in demand and stockholders take it at a high premium, the accumulations increase rapidly and the end comes soon. If the rates are low, the end is a long way off and the monthly payments must be continued a long time. If the company gets its maximum accumulation in two years, the monthly payments are $24 per share. If it takes four years to reach that point, then their payments are $48 per share. Hence, all parties

are interested in high rates. Even on the rates at which this plaintiff sold out, it is in testimony that if the rates could have been kept up to that figure he would have only had to pay seven per cent. for his money; in other words, the end would have come so soon that his monthly payments would not have been more than the money he actually got and seven per cent.

Even on the idea that he was borrowing the money, and was merely selling his interest in the dividend, it was wholly a matter of contingency whether he paid seven per cent., or more or less than that, for the money. This fact, this uncertainty or contingency, introduces into the transaction an element wholly foreign to an agreement to pay so much for the use of money. It may be that the borrower pays nothing; it may be that he does not really pay the whole of the principal. It may happen that he shall have to pay one, or two, or thirty per cent. It all depends on how soon the end comes; how high the *average* rates are. The contract is not a contract for the loan of money with interest, since the lender (if it is a loan) does not know what he will get back, or rather what the taker will eventually pay, since that depends entirely on how long it will take to reach the point of final winding up. The profits to the lender, or loss to the borrower, may be less or more than seven per cent on the amount received.

Treating this sale of the ultimate interest as a borrowing, let us see how it would be under, say, the rate of forty per centum premium. At forty per centum average sales, through the whole period, the concern will come to an end and the payments *stop* in about six years. Suppose one holding five shares, on the first meeting, takes an advance at forty per cent. premium, this would be $400 on the $1,000, or five shares. This would leave him $600 in cash.

His account would stand thus with the company:

*Company Cr.*

By cash.................................................$600 00

Parker *vs.* The Fulton Loan and Building Association.

## Company Dr.

Six years' monthly payments of one dollar per share
    on five shares..........................................$360 00
Six years' monthly payments of one dollar per share
    on five shares (interest)............................. 360 00

Amount paid in all.................................$760 00

Now suppose he had borrowed $600 00 at seven per cent.,
and kept it six years and paid it, the account would be:

Six years' interest on $600 00, at seven per cent.,
    $42 00 per year.....................................$252 00
Add the principal....................................... 600 00

Amount paid in all..........................$852 00

So that in the Association plan he pays $108 00 less than
seven per cent.

The settled rule is, that if any other element—as risk of
losing the whole or risk of getting less than the legal rate,
is a part of the contract, it is not usury. Usury is the taking
of more than the legal rate for the *forbearance.* If the lender
undertakes any risk, if the contract is of such a character as
that the borrower or taker of the money may not have to pay
the principal or may not have to pay as much as the legal
rate, then it is not usury. Now it is apparent—first, that
the great leading idea of this Association was, that it was an
advantage to its members to pay in small sums monthly, with
the right to anticipate their ultimate interest by selling that
out for its present worth at auction; and, second, that *bona
fide,* really and truthfully, it depended entirely upon the
*average price* the ultimate interests sold at, what rate each
purchaser was paying for his money. If the average price
was high, the end would soon come when the payments
would stop; if low, it would take a longer time, and the rate
of interest would be low or high accordingly. Each pur-
chaser had an interest in the profits—in the price of all the
sales—since, as that price was on the average, high or low, so
would his monthly payments continue long or end quickly.

In such a scheme as this, the great element of usury is wanting, to-wit: oppression—advantage taken by one of the necessities of another.   The person getting the money in this case, being, in fact, interested himself in having the sales as high as possible.   To permit the usurer himself to set up the usury, after the contract has been executed, would be contrary to all principle.   The person wronged is allowed so to do, but not the wrong doer, and if the plaintiff here recovers he will recover a part of the advantage which came to himself, from the high rates at which *others* sold their interest in the ultimate dividend.   We can easily see how a society of this kind might be used by schemers, to get money for themselves. But there is not a particle of proof that this was the case here.   All seems to have been carried on according to the professed object, to-wit: to enable individuals under an agreement to pay small monthly payments, to sell out for a present respectable sum, the ultimate share of each, in the final accumulation.   And we think the jury did rightly in finding there was no proof that this scheme was a mere device to evade the usury laws.

Assuming, therefore, that in the taking and in the sale of the stock in the contract the parties made, there was no violation of the law, it only remains to inquire, if in the settlement made there was usury.   The plaintiff admits that if he had *complied* with his *contract*, there would have been none. Has he done anything more than this?   It was directly agreed from the first that any stockholder who failed to comply with the rules, should be subject to certain penalties or forfeitures.   Nothing more was exacted in the settlement than the rules required.   Indeed, the settlement was more liberal than was provided by the regulations in case of failure.

We do not think the charge of the Judge, on the question of accord and satisfaction, was proper.   We agree that if there be a dispute, *bona fide*, as to whether or not any particular contract is tainted with usury, that the parties may, by accord and satisfaction, settle that dispute; but the pay-

ment of the usury is not such a settlement. It must appear that there was a *bona fide* dispute—uncertainty, doubt as to the existence of the usury—that the parties must have that doubt, dispute, distinctly in view in the settlement, and the resolution of the doubt must be a point of the settlement. We do not think there is any proof here to justify the inference of such a settlement, and we think the charge does not submit the law fairly to the jury under the proof. But, as we are satisfied that the contract was not usurious—as the jury must, under the law, have found there was no proof of usury—we will not reverse the judgment for this error.

Judgment affirmed.