J. S. MERONEY, Jr., v. ATLANTA BUILDING AND LOAN ASSOCIATION.

*Action to Enjoin Foreclosure of Mortgage—Building and Loan Association— Usurious Contract— Conflict of Laws—Lex Loci Contracti—Lex Loci Solutionis.*

1. Where a loan was made by a Building & Loan Association of Georgia to a citizen of this State on application to and through a branch agency of such Associatian located in this State and managed by a local treasurer and collector in this State, to whom payments were to be made and who received commissions on his collections and gave fidelity bond to the Association. *Held,* that the rights and liabilities of the parties under the contract (though the latter recited that it was solvable in the other State) must be determined by the laws of this State and not by the laws of the other State—it being the evident intent of the parties that the debt should be discharged by payments to the local treasurer in this State.

2. In the enforcement of a mortgage on land, the usury law of the State in which the land is will govern, the security having been given for money to be used in the State, though payment of the loan in another State was provided.

3. A foreign building and loan association, having some of the features of the building and loan associations organized under the laws of North Carolina, but having, in addition, power to raise funds by issuing interest and dividend bearing stock, to buy and sell property, in general, and to act as agent and trustee for the investment and management of Funds, is not entitled to exercise the special powers and privileges of such local organizations.

4. The transaction between a quasi building and loan association and its borrowing stockholder is simply a loan, and is usurious, where he is liable under certain circumstances, to pay more than the amount loaned and legal interest.

5. On an accounting between a quasi building and loan association and its borrowing stockholder, he should be charged with all he received, with legal interest thereon, and should be credited with entrance fee, stock dues, premiums, and interest on payments in advance of legal interest, and should not be charged with fines for noncompliance with provisions as to payment of premiums.

6. Act March 9, 1895, restricting, in its first section, building and loan associations to 6 per cent. interest, if held to allow greater interest by the provision of a subsequent section authorizing them to charge costs, expenses, interest, premiums, and fines, is repealed by Act March 13, 1895, prohibiting any one, without exception, to exact more than 6 per cent. for the loan of money.

ACTION to enjoin the foreclosure of a mortgage and for an accounting, heard before *Armfield, J.*, at Fall Term, 1893, of Cherokee Superior Court. There was judgment for the plaintiff and defendant appealed. The facts appear in the opinion written by Mr. Justice BURWELL before the expiration of his Term of office, and adopted in full by the Court.

*Messrs. J. W. & H. L. Cooper*, for plaintiff.
*Mr. J. W. Hinsdale*, for defendant (appellant).

CLARK, J. : The following full and convincing opinion prepared by Mr. Justice BURWELL at last term is adopted by the Court:

"The question between these parties is, What sum is legally due to the corporation, called The Atlanta National Building & Loan Association, from the plaintiff on account of a loan of $300, made by it to him on September 11, 1890, the payment of which was secured by a deed in trust made by the plaintiff and his wife to the defendant Goldsmith, by which they conveyed to him, as trustee, a certain town lot in Murphy, Cherokee County ?

"What the defendant corporation contends for as its dues under its contract with the plaintiff, is clearly set out in the letter of its able counsel, which has been made by it a part of its answer. This letter is dated March 10, 1892, is addressed to the plaintiff, and after telling him that the writer is instructed 'to foreclose said deed of trust,' gives him 'an

opportunity to settle' without a sale of his property, as follows : 'You were a subscriber to five shares of the common stock, Class "B" of said Association, upon which you have paid the dues of 60c per month on each share from March, 1890, to January, 1891, inclusive, eleven months, at $3 per month, $33. See By-Law, No 3. On September 11, 1890, you borrowed $300 from the Association and made your note and deed of trust to secure the same according to the charter and by-laws of the company. By this contract you agreed to pay the Association, in addition to the dues or monthly installments upon your stock which you contracted to pay upon becoming a stockholder, the sum of $3 per month as interest and premium on said advance until the stock should reach its par value ; and you stipulated that if you failed to pay promptly, when due and payable, the said monthly interest or premium, fines and monthly payments on said stock for a period of three months after the same became due or any installment thereof became due, then at the option of the said Association the whole indebtedness should at once become due and collectible. You owe interest and premium for the same time according to your contract—$3 per month for 14 months, $42. The Association has exercised its option and now requests due payment of the whole indebtedness.   You owe under your contract of subscription to five shares of stock, dues from February, 1891, to March, 1892, 60c per share per month, for 14 months at $3 per month, $42.   You likewise owe for 14 months at 10c a share per month, or 50c per month for 14 months, $7.   See By-Law, No. 8.   This makes a total of $91 to be added to the principal of your note, $300, which makes a total of $391.   By-Law 22, paragraph 22, provides :   'After a member has made not less than 11 successive monthly payments of dues, exclusive of the admission or entrance fee, provided he has paid dues for every month up

to the date of withdrawal and all fines or other charges against him, he may withdraw the amount of dues paid by him, less that part of the same apportioned to the expense fund,' as prescribed in by-law No. 25, with interest at 6 per cent. per annum for the average time on the amount withdrawable. Paragraph 4 of the same by-law provides: 'No withdrawal of shares which are in arrears will be allowed until such arrears with all fines and other charges have been paid; payment of dues must be continued until the month of actual withdrawal; the admission or entrance fee and the ten cents per share per month appropriated to the expense fund cannot be withdrawn. Sixty days notice in writing to be signed by the shareholder is required for all withdrawals. A withdrawal fee of $3 must be paid on each certificate. Each notice to withdraw will have attention in order in which it is received. Dues are the monthly installments paid on shares and do not include the admission or entrance fee of one dollar per share.' By-Law 25 provides: 'There shall be retained and reserved from the monthly dues paid on the shares the sum of ten cents per month per share for the payment of expenses, to be known as the expense fund. The excesses over and above expenses to go to the profit account.' In this settlement the company will concede to you the withdrawal value of your shares as if you were not in arrears. Your dues on stock from March, 1890, to March, 1892, at $3 per month, would be $75, less expense fund ten cents a share, fifty cents a month, for 25 months, $12—leaving due $62.50. Add interest at 6 per cent. for average time, 12 months and a half, $3.40—making $65.90, less withdrawal fee $3—leaving $62.90. So deducting from $391, the credit of $62.90 we have $328.10 as the amount which the Association is now claiming to be due by you. If the same shall be paid without foreclosure you will be relieved of the additional expense

of 10 per cent. of $32.10, attorney's fee and expense of sale. Unless you shall at once pay to me the amount due by you to said association, I shall under my instructions proceed to foreclose the deed of trust according to law.   I will call your attention to the fact that this contract is solvable in Georgia and is made with reference to its laws.   The Courts of Georgia have decided such a contract to be valid and binding.'

" The defendant is organized under the laws of the State of Georgia and an examination of its charter, a copy of which is filed with the brief of its counsel, discloses the fact that the scope of its power is very extensive. ' The object of said Association,' it is said, ' shall be pecuniary profit for its stockholders, to encourage the saving of small sums of money, to aid persons of limited means in obtaining homes, the accumulation of a fund which shall be paid in monthly instalments by its stockholders, and lending the same on real estate, personal or other acceptable security to members of said association or to persons not members thereof or to corporations, and to take and hold deeds, mortgages, executions or other liens, or personal security therefor, to sell, assign, transfer or otherwise dispose of all such securities or any part thereof ; to make, issue and sell bonds or other obligation based on the security and property held by the association ; to buy, sell, own and deal in any real or personal property ; to improve any such real estate by erecting buildings, machinery or other appliances for increasing the value thereof, to lease or rent the same, and to sell the same for cash or on instalments ; also to act as agent or trustee for the investment and management of funds for persons, corporations, administrators, executors, guardians and trustees.   To carry out all of which objects, as well as to do any and all other acts or things necessary and lawful in the prosecution and management of said busi

ness and businesses, petitioners pray to be invested with full power and authority.'

"And by its charter it is given full power and authority to carry out all these objects of its organization.

" Now, if we leave out of our consideration, for the present, all questions about the alleged special powers and privileges of this corporation, and all questions that pertain to the intricacies of the business of Building & Loan Associations, and the application of payments made by the borrower from such an association on stock in liquidating his indebtedness, we have here a loan of money made by a foreign corporation to a citizen of this State and secured by mortgage on land in this State, at a rate that is plainly usurious under the law here, 12 per cent. (6 per eent. as interest and 50 cents per month as premium) and an insistence by the foreign lender that, because it is stipulated in the contract that it is 'solvable' in the foreign State and is made with reference to its laws, and those laws allow the taking by it of that rate of interest for the loan of money, the courts of this State are bound to enforce such a contract by a decree of foreclosure.

"The proposition challenges careful attention. It is important that foreign capital invested within our borders shall have, to the very utmost, its just dues, and that it shall find our courts ready now, as they have always been, to protect its interest and enforce all its lawful rights. But it is important also that the settled policy of the State should be upheld by its courts, and that schemes which to them seem manifestly adopted merely to evade its usury laws should not be allowed to bring about a virtual abrogation of those statutes.

"If a foreign bank or other lender of money may establish local branches or offices in this State, and through its agents solicit and take application for loans on mortgages of land

here to be sent to the home office, to be passed upon and allowed there, and if, because of such arrangement, and the insertion of a statement, put in the note or mortgage that the contract is ' solvable ' in the foreign jurisdiction, and is made ' with reference to its laws,' the courts of this State are required to enforce such contracts, and decree a foreclosure of the mortgage, and a sale of the land, that the foreign usurer may have his usury, then, surely will it have come to pass that it is no longer true that there is no ' cover or device " by which the wholesome restraints put upon the money lenders by our statutes may be escaped.

"Upon this subject there is in *Martin* v. *Johnson,* 84 Ga., 481, a most emphatic declaration from the highest Court of the State, that is the domicile of the defendant corporation. A loan of money had been made by a citizen of Massachusetts through an agent in Georgia to a citizen of the latter State, secured by mortgage on land there but payable in the former State. It was contended that the rights of the mortgagee were not to be governed by the laws of Georgia in respect to usury because the note was payable in Massachusetts. The Court said : 'If this Court should hold that a note made in this State but payable in the State of Massachusetts for money advanced by the agent of a person who resides in Massachusetts could be collected notwithstanding it contained sixteen per cent. usurious and unlawful interest, then the law of this State as to usury would be inoperative and useless ; the money lenders of those States that have no usury laws but which allow to be collected any rate of interest contracted for, could flood this State with their agents and by the loan of money exact the highest rate of interest, even a hundred per cent.'

"It seems, therefore, that the principle for which the defendant corporation contends is denied in the Courts of its

own domicile—that a foreign money lender, loaning money in Georgia on mortgage on Georgia land, must be content in a foreclosure proceeding to have the amount due determined by Georgia law.

"The reasons that support the rule there are valid here. The rules of comity require us to allow foreign corpora-. tions a standing in our Courts to enforce the valid contracts they may have made with our citizens, and all such liens upon property situated within this State as they have lawfully acquired. But that comity does not require that we should allow foreign corporations to enforce contracts here if such enforcement would be in conflict with our laws, and, being thus in conflict, the enforcement thereof would work against our own citizens, and give to the foreigner an advantage which the resident has not. *Walters* v. *Whitlock*, 9 Fla., 86 (76 Am. Dec., 607). Much less does it require that we should allow a Georgia corporation to enforce a mortgage loan which is illegal and void by our laws ( *Ward* v. *Sugg*, 113 N. C., 489) while in that State the rule is as stated in *Martin* v. *Johnson, supra.*

" It is well settled, so well settled that authorities need not be cited, that a purely personal contract made in one place to be executed in another, is to be governed by the laws of the place of performance. This general rule is subject to the qualification that the parties act in good faith, and that the form of the transaction is not adopted to disguise its real character. Tyler on Usury, 83.

"Now, it seems very manifest to us, considering all the facts and circumstances, that this Georgia corporation required the plaintiff, a citizen and resident of this State, to declare, in the obligation given by him to it for the money loaned him, that the contract was solvable in that State and was made with reference to its laws, not because it was con-

templated by either of the parties that the money would be paid there, or that the parties would enforce their respective rights under the contract in the courts of that State, but because this money lender desired to escape the restraints of the laws of this State, and, by this formal declaration inserted in the contract, compel the courts of this State in a suit for the foreclosure of the mortgage to adjust the rights of the parties according to the laws of Georgia and the decisions of its courts, and in disregard of the laws of this State and the decisions of this Court.

The by-law in relation to the establishment of local branches is as follows: 'In accordance with the authority conferred in its charter this Association will establish local branches in Georgia and other States at such points as the board of directors may approve. The local branches shall elect their own officers and directors and may make such by-laws as they desire to govern their own bodies not inconsistent with those of the parent office. The treasurers of the local branches shall give such bonds to the association for the faithful performance of duties and the prompt remittance of all collections by them, as the board of directors of the parent office shall determine in each particular case. They shall receive two per cent. on all collections from the local branches made and paid over to the treasurer of the parent office by them.'

"It appears from the record that there was a 'local branch' at Murphy, through which this loan was negotiated. It is evident that the borrower was expected to make his payments to the treasurer of this local board, who was under bond 'to the Association' for the prompt remittance of all collections. The by-laws provided for compensation for this treasurer—two per cent. of his collections. The local treasurer must be considered the collecting agent of the Association. A payment to him must

be considered a payment to the Association. Asseveration that he is the agent of the local branch, not the parent company, that he was expected to receive and remit money, not as agent of the lender to whom he had given bond for the faithful performance of his duties, but of the borrower, cannot avail. It is evident that this contract, which the borrower was required to say was solvable in Georgia, was in fact to be solved by payments to this local treasurer, and that the form of the transaction was adopted to disguise its real character.

"Considering the transaction therefore without any regard to the intricate questions pertaining to what are called Building & Loan Associations, but merely as a loan of money made by a money lending corporation of another State through its local branch in this State, in the manner detailed in the case on appeal, to a citizen here, we conclude that in this contest between the parties as to their respective rights and liabilities under the contract, those rights and liabilities must be determined by the laws of this State; that it is, in truth, a North Carolina contract to be governed by our laws, and not a Georgia contract to be governed by the laws of that State.

"If there was no local board and no local treasurer; if the application of this resident of North Carolina for a loan of money to be secured by a mortgage on land in this State, to be executed here, had been forwarded directly to the home office of this foreign corporation, and had been there granted upon the condition that the note or bond given by the borrower should be made payable at the home office, and should bear interest at a rate allowed by the laws of that jurisdiction but illegal here, it has been declared by high authority that, in a suit to foreclose the mortgage, the decree of foreclosure will limit the recovery of the lender to the rate of interest allowed by the laws of this State.

Wharton in his treatise on the Conflict of Laws, section 507, says of the question : 'Whether, when a mortgage is given as security for a loan, and the mortgage is in one State and the place of payment of the loan is another, the law of the former State or that of the latter State is to prevail in the settlement of interest ; ' that it has been frequently litigated in the United States, and 'with results which on their face are irreconcilable.' And the learned author says : 'The true test is, was the mortgage merely a collateral security, the money being employed in another State and under other law, or was the money employed on the land for which the mortgage was given? If the former be the case, then the law of the place where the money was actually used, and not that of the mortgage, applies. If the latter, then the law of the place where the mortgage is situate must prevail.'

" It is stated in the elaborate brief of the learned counsel for appellant that the authorities cited by Wharton do not sustain the rule thus laid down by him. Among these cases is *Chapman* v. *Robertson*, 7 Paige, 627, in which it was adjudicated, as stated in the head-notes of that case in ,31 Am. Dec., 264, that ' The construction and validity of personal contracts depend on the laws of the place where they were made, unless they were entered into with the view of being performed elsewhere,' and also that ' transfer of land or other heritable property, and the creation of liens thereon, is governed by the laws of the place where such property is situate.' Of this case FOLGER, Justice, said in *Dickinson* v. *Edwards*, 77 N. Y., 573, ' *Chapman* v. *Roberson*, is a case often cited and relied upon, but it does not impinge the general rule that the validity of a purely personal contract is to be tried by the law of the place of its performance. The learned Chancellor concedes that the case would have come clearly under that principle

if the contract in suit had been only the personal contract of the defendant; but he holds that as it was a mortgage actually executed here, by a resident here, upon land here, for money borrowed to be used here, though to be returned elsewhere, the law of this State would fix the legality of the rate of interest reserved, and he further reasons that the contract was partially made here actually in reference to our laws, with an appeal to our Courts contemplated by the parties, if necessary.'

"A distinction seems thus to be clearly recognized between a contract, 'purely personal,' as for instance a promissory note executed in this State, but made payable *bona fide* in Georgia, and a contract not 'purely personal,' as for instance a loan of money by a citizen of Georgia to a resident here to be repaid in that State and to be evidenced by note, so payable, and mortgage on land in this jurisdiction. In *Jackson* v. *Am. Mortgage Co.*, (a Georgia case) 15 S. E. Rep., 812, BLECKLEY, C. J., speaking of a loan of money made by the defendant to the plaintiff in New York, but secured by mortgage on land in Georgia, where he resided, says: 'There was not one contract for making the notes, and another for securing them by a conveyance, but a part of one and the same contract was expressed in the notes, and a part in the deed executed at the same time. There was no intention to make a loan without having it secured both by the notes and the deed. It was therefore impossible to accomplish the object without calling in the laws of Georgia as a part of the transaction. New York had no law which could make any contract conveying land situated in Georgia operative or obligatory. As the laws of Georgia would thus be essential with respect to a part of the transaction, that law if possible, ought to be applied to the whole. There was no intention to make a mere personal contract, but the scheme was to make one partly per-

sonal and partly confined by its very nature to a given situs, to-wit, the State of Georgia.' See, also, *Martin* v. *Johnson, supra*, which was a suit to foreclose a mortgage, the debt being payable in Massachusetts. It is there said : 'There is a portion of the contract which under no circumstances could be enforced in the State of Massachusetts— that as to the land upon which it is sought to set up a lien. Nor do we readily see how any portion of this contract could be enforced in the State of Massachusetts against a person resident in the State of Georgia.'

"The difference in the contracts makes a difference in the rule applicable to their enforcement. Hence, in *Pine* v. *Smith*, 11 Gray, 38, it was decided that a note made in Massachusetts and secured by mortgage on land in that State, although payable in New York, was to be construed by the Massachusetts law; and in *Thompson* v. *Edwards*, 85 In., 414, it was held that if A of Indiana borrowed in Indiana, on notes secured by a mortgage on land there, money of a citizen of New York, some of the note being payable in New York, and some specifying no place of payment, the contract was an Indiana contract, and the question of its being usurious was to be tested by the law of that State. In *Pancoast* v. *Ins. Co.*, 79 Indiana, 172, the notes and mortgage were payable in Connecticut, and the Court said : 'It is true that the notes and mortgage are made payable in Hartford in the State of Connecticut. But it is true that they were executed in this State, the mortgagor lives in this State, the lands lie in this State, and from the terms of the mortgage it is clear that the intention of the parties was that the contract was to be enforced in this State. The mortgage could be enforced no where else. In such a case the law of this State governs, the rate of interest being fixed in accordance with the laws of this State.'

"The doctrine which Dr. Wharton announces seems to us just and reasonable. It has been repeatedly held that such transactions would constitute 'doing business' in this State so as to subject the foreign money lender, thus conducting himself, to a license tax. Murfree on Foreign Corporations, Sections 65, 69, and cases cited. The contention of the defendant corporation seems to us to amount to this: That it must be allowed to do business in North Carolina in total disregard of North Carolina's statutes and the decisions of her Courts; that it shall be allowed to take mortgages on North Carolina land from a resident owner for money loaned to the resident, to be used here, and foreclose them in North Carolina courts, where alone jurisdiction for foreclosure could reside, and where alone it must have contemplated enforcing its rights, if a resort to courts should be necessary, not by North Carolina statutes and the decisions of her courts, but by Georgia statutes and the decisions of its courts; in fine, that it shall be allowed to override in the courts of this State the laws of this State and its well settled policy as to the borrowing and lending of money.

"We cannot accede to this proposition, but, instead, we choose to adopt the doctrine announced by Wharton, quoted above, which seems to us more reasonable and which he assures us is sustained by the authorities.

"We have indeed, as it appears to us, an affirmance of that doctrine in *Commissioners* v. *Railroad*, 77 N. C., 289, where the learned Justice RODMAN, speaking of certain bonds which the defendant company had delivered in New York and which were payable there, and which, it was contended were 'governed by the laws of New York in respect to the rate of interest,' says: 'These bonds were clearly a North Carolina contract; the precedent debt, which was the consideration, was incurred and payable in North Carolina;

both parties resided in North Carolina; the bonds were secured by a mortgage on real property in North Carolina, which could only be enforced through the courts of this State. In our opinion the bonds could legally bear no greater rate of interest than that allowed in North Carolina.'

"Now, if the reason given by this able Judge for declaring that these bonds were clearly a North Carolina contract, be analyzed, it will be found that the fact that 'both parties resided in North Carolina' could not have been an important factor, for in *Roberts* v. *McNeely*, 7 Jones, 506, it was proved that both parties lived in Salisbury in this State, and yet the contract between them, a promissory note, executed at their residence, but payable in New York, was declared to be governed by the law of that State as to the rate of interest it would bear—to be a New York contract in this respect. The really controlling reason for the conclusion announced so unhesitatingly about that contract seems to have been that the parties manifestly contemplated the courts of North Carolina as the tribunal for the enforcement of the contract, the security, the mortgage, · being enforcible, as is there said, only through the courts of this State, and, this being so, the laws of the former must govern the rate of interest.

"We do not deem it necessary to discuss each one of the many authorities cited by defendant to show that our courts must be governed by the decisions of the courts of Georgia in ascertaining what is due, on an accounting, from this mortgagor to this mortgagee. In not one of them, so far as we can see, did the court enforce a contract which was illegal and void by the law of the forum, illegal and void by the law of the place where the contract was made, and illegal and void by the law *rei sitae*, and valid, if at all so, only by the *lex loci solutionis*.

"*Falls* v. *U. S. Saving, Loan and B. Company* (an Ala-

bama case) 13 So. Rep., 25, was an action to foreclose a mortgage. The facts were very similar to those in our case. The Court decided that 'the contract which gave rise to the present suit is an Alabama contract, and can only be enforced to the extent our statutes permit,' and added: 'Any statute of this State which may be supposed to confer on Building and Loan Associations the right to charge more than 8 per cent. interest, even if we concede such statutory authority, must be confined in its operation to such corporations as are chartered in Alabama. It cannot be supposed that our legislation had a greater purpose or intent than that.' In that case, as in this, the borrower was required to have paid three months' instalment on stock before he could obtain a loan, and yet that Court declares that the transaction was 'practically a loan of money,' and quotes from *Uhlfelder* v. *Carter*, 64 Ala., 527, the following language: 'In determining whether a contract is infected with usury, its substance and effect, not its form, are material.'

"Holding therefore, as we must, that the contract of a loan between this mortgagor and mortgagee is governed by the laws of this State, we come to the question, what is due the mortgagee according to those laws?

"We are met at the threshold of this investigation by the contention of the defendant corporation that being a 'Building & Loan Association' it is entitled to exercise the same powers and privileges as if it had been organized in this State according to the provisions of *The Code*, Vol. 2, Ch. 7 ; that the same effect is to be given to its contract with the plaintiff, as if it were a North Carolina corporation, formed in strict compliance with the provisions of that chapter of *The Code*, and therefore entitled to exercise special powers and privileges.

"'A Building and Loan Association is an organization

116—57

created for the purpose of accumulating a fund by the monthly subscriptions or savings of its members to assist them in building or purchasing for themselves dwellings or real estate by loaning to them the requisite money from the funds of the society upon good security.' Am. & Eng. Enc. of Law, Vol. 2, p. 604. Mr. Endlich (Sec. 283) speaking of the proper and legitimate purposes of the creation of such corporation, says : ' To all practical intents, it may be said to be to enable a number of associates to combine and invest their savings to mutual advantage, so that from time to time any individual among them may receive out of the accumulation of the pittances which each contributes periodically a sum, by way of loan, wherewith to buy or build a house, mortgaging it to the association as security for the money borrowed, and ultimately making it absolutely his own by paying off the incumbrance out of his subscription.    It is only so far as they serve these purposes and are confined to the objects necessarily involved therein that the acts of building associations fall properly within the powers granted.    As soon as they transgress these limits, they are *ultra vires.*'

"Nearly every State in the Union has a general statute relating to the incorporation of Building & Loan Associations or Associations of that class called by some name of similar import.    Each of these statutes differs from the other.    All agree in this that the contemplated organizations are all strictly co-operative in their nature.    Professor H. B. Adams, of Johns-Hopkins Uinversity, an eminent writer on economics, in his essay on corporations, in Volume 13 Appleton's Encyclopedia (Annual 1888) speaks of these Associations as a 'peculiarly American form of co-operation.' Mr. A. B. Burke, to whom Mr. Endlich acknowledges his indebtedness in a note to section 7 of his work, cited heretofore, has lately used the following language in a journal

published in the City of Philadelphia : 'As the term Building Society is very indefinite, and as applied to Philadelphia Societies an actual misnomer, it is necessary to specify exactly what is meant by such Society.   The name was first applied to organizations which built houses to be sold. It was also applied to speculative loan associations whose stockholders had no relations with the borrower, except that of lenders of money ; and more recently it has been applied to 'National' Loan Associations, having agencies all over the Union, and salaried officers and agents.   The term 'Building Society' as here used is not intended to apply to any organization of the character above mentioned. It is essential that the true plan should be  clearly under-stood, and that its co-operative principles should be faith-fully followed, or those who are tempted to imitate  the Philadelphia working-man in buying a house may    *    * lose, not only their money, but their faith in co-operative enterprises.'

"If we consider the scope of the powers of this corpora-tion, we find that they far exceed those conferred upon 'Homestead & Building Associations' by *The Code* of this State.   The powers conferred upon it have been heretofore fully set out, and need not be repeated.   Suffice it to say that it has powers under its charter to do things far exceed-ing in risk the assisting of its members 'in building or pur-chasing for themselves dwellings or real estate.'

"If we consider the manner in which its funds are to be raised, we find that it is not by 'accumulating a fund from the monthly subscriptions or savings of its members,' but mainly by inducing capitalists to invest their surplus in one or the other of the kinds of stock provided for in the follow-ing by-law : '2. Full-pay-interest-bearing stock in class B which shall be sold at $50  per  share and which shall bear interest at 6 per cent. per annum, payable semi-annually,

on $50 per share.  This stock shall be redeemable upon maturity of the installment stock in said class, at $100 per share, less the aggregate sum of dividend paid thereon.'

"3.  Permanent investment stock which shall be sold at $100 per share and which shall participate in the profits of the Association from the date of issuing the certificate of stock to be paid semi-annually, to-wit, on the first day of February and August of each year.  The par value of all stock at maturity shall be $100 per share.  A member may hold any number of shares.'

"A corporation having the authority to incur such risks and responsibilities and deriving its funds from such a source in whole or in part, is not a Building & Loan Association except in name.  It is merely a money-lending, dividend-paying corporation, to which, for some purposes, some features of a "Building & Loan Association" have been attached.  Its purposes and powers put it outside of the pale of the beneficent statute which was intended to encourage· co-operation among the saving poor, and not to aid the rich in finding good investments for their capital.

"The purpose had in view by the legislation of the different States allowing the incorporation of these Building & Loan Associations, as they are called, is thus stated by Mr. Endlich in Section 119 of his work on the laws of such corporations :  'As a mere saving institution, the building association would never have recommended itself to the favor of legislatures to so unprecedented a degree.  As a mere bank for the depositing of money lying idle, for the purpose of fructifying it for the rich, by fleecing the needy, it would never have acquired the unusual rights it exercises.  But the idea, the possibility, of making membership in it the means of raising a property-holding, homestead-owning class of citizens, precisely as to those whose improvident habits and petty earnings had hitherto debarred them from

the blessing, or feeling the stimulus of the prospect, of owning their own homes,—the desirableness of augmenting the proportion of land owners among the working classes, particularly in a Republic, seemed so weighty a consideration in the minds of legislators, that they were willing, in exchange, to make a sweeping exception to many of the best settled rules of general policy applicable to dealings between man and man.'

"If, as the defendant contends, our statute confers upon building and loan associations those special powers and privileges, constituting, as the learned author says, 'a sweep ing exception to many of the best settled rules of general policy applicable to the dealings between man and man,' it is certain that no corporation except such an one as is contemplated by the statute can lay any claim whatever to those special powers and privileges.

"A true Building & Loan Association, such as our statute provides for, has no authority to declare or pay dividends on its stock. Endlich on the Law of Building Associations, Sec 324. 'As to participation in profits, the scheme has reference to the final adjustment of accounts, not to any intermediate realization.' The defendant corporation has two classes of stockholders to whom, as shown by the by-law heretofore quoted, dividends are to be paid each year, and, having power so to conduct its business, is not the kind of an association which our legislature designed to promote. A corporation of that class cannot risk its members' money and houses by engaging in many of those enterprises enumerated in the defendant's charter heretofore set out. The defendant has 'full power and authority' to do all those things. Therefore, it is not of that class and can lay no claim to those special powers and privileges with any justice whatever.

"In Section 39 of Mr. Endlich's treaty it is said that

these associations are founded upon principles of strict mutuality and equality of benefits and obligations. A corporation not founded on those principles cannot be truly a building and loan association within the purview of our statute. The benefits are not strictly mutual and equal where one stockholder, according to the plan of the organization, is entitled to semi-annual interest on what he has paid in, and another to semi-annual dividends, while others must await the termination of the life of the association or some other time, indefinitely future, before reaping any profits. There is no strict equality of obligation, where one stockholder pays $50 for a share of stock, and another obligates himself to pay $100 per share.

'In Maryland, a corporation which made its loans to members in the approved form of building association loans, but whose aims and nature did not bring its property within the statute as a building association, was not allowed to enforce reservations lawfully permitted to such institutions.' Endlich, Sec. 355; *Williams* v. *B. B. Loan & Annu. Asso.*, 45· Md., 546. The same doctrine is established in Pennsylvania. *Jarret* v. *Cope*, 68 Pa. St., 67; *Kuffert* v. *Guttenburg B. Ass.*, 30 Pa. St., 465; *Rhoads* v. *B. Asso.*, 82 Pa., 180.

The wisdom of this doctrine will be apparent, we think, to all who will consider the possible consequences of a contrary rule.

For illustration : Let us assume for the sake of argument that a building and loan association organized under our statute has a right to loan money to its members at the rate of $\frac{1}{2}$ per cent. per month and a like 'premium,' or one per cent. per month; that it requires its members to pay 60c per month as dues on each share of $100, of which ten cents is to go to the expense fund of the association, and enforces prompt payment by a fine of

ten cents per month per share.   Let us now suppose that one of those worthy citizens for whose special benefit it is said this 'beneficent statute' was adopted, is induced to subscribe for ten shares in one of these beneficent institutions.   His first duty is to pay $10, for the privilege of being enrolled.   Let us assume that the agent who induced him to subscribe takes this for his trouble, and give that particular sum no further consideration.

"Let us now suppose that this member, wishing to become a home owner, selects one to cost $1500, and, using $500, which he had and one thousand dollars borrowed from the association on a mortgage of the property, he takes the title and bravely sets out to battle with the debt he has incurred, to provide a home for his family, in good cheer at the prospect held out to him by the company's agent that at the end of seven years 'at the farthest' his ten shares of stock will be worth one thousand dollars, and that then, by a very simple process of adjusting the accounts, he will at the same moment cease to be a debtor to the association and also a stockholder in it, and the mortgage on his house will thereupon be cancelled.   Let us assume that the mortgage provides that he will pay 'said monthly interest or premium, fines and monthly payments on said stock' until the said shares shall become fully paid in and of the value of one hundred dollars each, as the mortgage set out in this record does.

"Now let us suppose that this working-man at the end of seven years, having promptly, out of his hard earnings, paid each month ten dollars interest and six dollars stock dues to the association, asks that his stock be exchanged for his debt and his home be disincumbered of its lien, and is told that, while the soliciting agent was no doubt entirely sincere in his belief that the payments thus far made by him would satisfy his indebtedness, those rosy-

hued hopes constituted no part of the contract; that it stipulated that he should keep up his dreary round of monthly payments until he had fully paid up his stock and it was worth one hundred dollars per share—that contrary to every body's expectations the expenses had been larger than was anticipated and net profits had been smaller than hoped for, and that his stock was not worth one hundred dollars per share, as the books of the company plainly showed; that, while his engagement was that, if the exigencies of the association required it, he would pay one thousand dollars in stock dues alone, he had in fact only paid $504 (.$84 times $6) on that score, and out of that he had agreed that $84 ( 840 times 10c. ) should be used in expenses, leaving, it might be, only $420 really credited on his stock account. Let us suppose that, still hoping for good results, he resumes his payments and toils on; that from month to month, from year to year, the happy day when the stock is worth par is put off by accumulating expenses and constantly recurring losses until at the end of 166⅔ months he insists that his stock dues, at least, in any event, are all paid, because 166⅔ payments of 60 cents each amount to one hundred dollars, and is told that 10 cents of each 60 cents paid in by him had according to his agree-ment been applied to the expenses, and that the Association was in debt, and that all the subscriptions for stock, which he was informed constituted a trust fund, must be paid in, and hence, as the expenses of the business, including the interest and dividends paid to certain classes of the stockholders, had consumed all the profits, it would be required of him to pay stock dues for two hundred months, as it takes 200 times 50 cents to make one hundred dollars. Let us suppose that he continues his payments for two hundred months, and thus, beyond all question, pays all his stock dues, and when he then asks for the application of

his paid up stock to the satisfaction of his mortgage debt, is told that, while the company was called a building and loan association, it had acted also as agent or trustee for the investment and management of funds for persons, corporations, administrators, executors, guardians and trustees — that it had dealt in real estate, and had been engaged in erecting buildings and machinery thereon, and that those enterprises, all of which were *infra vires*, had proved disastrous, and is informed that, though the receiver who had been appointed to wind up the affairs of the corporation would find that his stock was all paid in, and that there was no claim against him on that account, he would also ascertain that the stock of the company was of no value, owing to the disasters that had come upon some of its various undertakings, and that it would be necessary for all mortgagors to continue to pay the interest (12 per cent.) on the amounts advanced to them, until he had collected enough to adjust all the liabilities of the company, or else to take advantage of the option allowed and pay back the whole sum borrowed—one thousand dollars—at once.

" Surely the trusting home builder, caught in such toils, might justly exclaim against a statute, called beneficent, that would produce such a result. Such an outcome is possible. Of its probability in different degrees it is not for us to judge. The class to which the defendant corporation is by us to be assigned is the point under consideration—whether to the class of money-lending, dividend-paying corporations of the investors of capital, or to a class of incorporated associations, co-operative in their very nature, and designed by means of such co-operation to foster a homestead-owning class of citizens with little risk to them because of the severe limitations put by the law of their creation upon the corporate powers and purposes. An

examination of the charter of the defendant corporation, its methods and powers, leads us unhesitatingly to put it in the first named category, and to declare that there is no such conformity by it to the building and loan associations of our statute as to entitle it to claim any special rights or powers therein granted to associations organized according to its terms, with the limited powers and the restricted purposes therein set out.

'If the charter of a building association, or what is called its constitution,' says Mr. Endlich, section 64, ' contains the grant of power  *  *  *  in excess of what the statutes regulating the formation and powers of such organizations sanction, the objectionable grant is simply void. Each such illegal feature may become the basis of a proceeding by the State against the society, and result in the forfeiture of the franchise.'

Applying this principle to the case in hand, we have here a corporation calling itself a Building and Loan Association and asserting the possession of special powers and privileges as such, and yet having in its charter or constitution grants objectionable because in excess of what our statute, regulating the formation and powers of such organization, sanctions. We cannot declare these objectionable grants simply void, for the State of Georgia had the right to invest this legal entity of its creation with all of these powers. Each such feature cannot become the basis of a proceeding by this State against the society, and ' result in the forfeiture of the franchise,' for those features are not, it seems, illegal where conferred, and the power of forfeiture which this commonwealth may properly exercise over the corporations of its own creation cannot be applied to this foreign corporation. A member of this association, who should seek in the courts an injunction against the exercise by its managing board of these powers and the

assumption of the accompanying risks, or should endeavor to hold those officers responsible to him for losses incurred in the exercise of those powers upon the ground that a building and loan association, within the purview of our statute, could not lawfully engage in such business and incur such risks, would be promptly confronted with the reply, not to be gainsaid, that the restraints of our statute could not affect the right and powers of this foreign corporation. Because of these things it must follow that there is no course open to the courts of this State but to declare that the so-called building and loan associations whose charters legally invest them with the powers not contemplated by our statute (*Code*, Vol. 2, Ch. 7) are not building and loan associations within the purview of that statute.

"We come now to the consideration of the defendant corporation's contention that its contract with the plaintiff 'without reference to the statute specially authorizing it, is not usurious.' Here we may quote the language of O'NEAL, C. J., in *B. & L. Asso.* v. *Bollinger*, 12 Rich. Eq., 124, when speaking of a contract similar to the one we have under consideration : 'How the contract can be anything else than usurious it is difficult to conceive. Indeed it must task, and has tasked human ingenuity in every tribunal where the question has been presented, to find the reason whereby such a contract could be sustained.'

"The defendant's counsel sets out as the basis of his argument the following facts :

"First, The contract of borrowing is separate and distinct from that of subscription, and the obligation to pay monthly dues upon the stock was incurred by the contract of subscription.

"Second, The money which Meroney received, whether considered as an advancement upon a portion of his stock

or as a loan, was never to be repaid except by the maturing of his stock at an uncertain time.

"Third, If Meroney should perform his contract, it would be uncertain whether he would in the end pay more or less than eight per cent. interest, upon the statement of an account, with the strong probability in favor of his paying less.

"Fourth, His liability to pay a greater rate of interest than eight per cent. was caused by his own default, which he might have avoided by simply keeping his contract.

"Fifth, Being interested as a stockholder, only three of his five shares having been pledged to the association, Meroney was directly interested in any profits which the company might make upon his loan. It was in the nature of a dealing with partnership funds.'

"As to all this we may say what was said by Mr. Justice READE in *Mills* v. *B. & L Asso.*, 75 N. C., 292: 'We look at the substance'; or what was said by Judge GASTON in *Shober* v. *Houser*, 4 Dev. & Bat., 91; 'It is the duty of Courts to look not merely at the words but at the substance of the transaction; on the one hand, not to be governed by the words, if the substance goes to defeat the provision of the statute, and, on the other hand, not to rely on the words, so as to defeat the contract, if in substance the transaction be legal. * * * In spite of every effort of the Courts to carry into complete effect the legislative will, no doubt the true character of usurious securities is very frequently concealed under cunning contrivances, but when that character is seen, whatever may be the contrivance, the Court must and will act upon the transaction such as in truth it is.' We see in this whole transaction only a lending of three hundred dollars to the plaintiff at 12 per cent. per annum, payable monthly, coupled with an engagement on the part of the defendant that if the plaintiff makes no default in

his stipulated payments, whether as borrower or stockholder, the defendant would not require the repayment of the sum advanced or loaned to him until the value of his stock reached one hundred dollars per share, and that in that event three shares of his stock should cancel the debt. A contract for the loan of money is usurious, if the lender reserves the right in any event to collect more than 8 per cent. and the sum loaned. The liabilty of the plaintiff to pay a greater rate of interest than 8 per cent. grows out of the contract. The existence of such liability shows the contract to be usurious. We quote as applicable here, the emphatic language of Justice READE in the case cited above : 'We know of no device or cover by which these associations can take from those who borrow their money more than the legal rate of interest without incurring the penalties of our usury laws. Calling the borrower a 'partner' or substituting 'redeeming' for 'lending' or 'premium or bonus' for an amount which they propose to have advanced, and yet withhold ; or dues for interest, or any like subterfuge, will not avail. We look at the substance.' The doctrine announced in that case by the learned Justice has been consistently followed by all the decisions of this Court since that time. It was foreshadowed by the strong language of Chief Justice PEARSON in *Smith* v. *Mechanics Building & Loan Asso.*, 73 N. C., 372, the first case in which such an association appeared in this Court, and in which Mr. William N. H. Smith, afterwards Chief Justice of this Court, was of counsel for the association, and filed an elaborate brief in which he argued many of the points now again presented. Yet this learned Chief Justice, who had himself, as counsel, argued earnestly to the contrary, yielded cordial assent to the doctrine of the Mills case, and the opinions of this Court in *Overby* v. *B. & L. Asso.*, 81 N. C., 56; and *Hoskins* v. *B. & L. Asso.*, 84 N. C., 838, delivered by him, distinctly affirm the rule there

laid down, which is also approved in *Dickerson* v. *B. & L. Asso.*, 89 N. C., 37 ; *Pritchard* v. *Meekins*, 98 N. C., 244, and *Heggie* v. *B. & L. Asso.*, 107 N. C., 581. Indeed, that the doctrine of the Mills case is well settled in this State is recognized on all sides. Mr. Endlich says (Sec. 347) that that case has been consistently followed in cases arising subsequently in this State. And in the American & English Enc. of Law, vol. 2, p. 612 (note) North Carolina is put among those States where the transaction between a Building & Loan Association and its borrowing stockholder is 'considered simply a loan.' The legislative branch of the State government has tacitly recognized and approved the doctrine of the Mills case and those cases that follow it ; for, though the General Assembly has repeatedly convened since the adoption by this Court of the rules applicable to the conduct of the business of Building & Loan Associations organized under the statute of 1868-'9, it has never seen fit to alter that statute so as in any way to free them from the effect of those rules. If the contract under consideration must, according to the well settled doctrines of this Court, be held to be clearly usurious though the defendant corporation were a true Building & Loan Association under our statute, much more clearly is it usurious when made by a corporation having, as we have said, no just claim whatever to such special powers and privileges as such Associations may be entitled to, if any. Our Constitution most wisely provides that 'No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services.' Can the Legislature grant to a corporation, or to a certain class of corporations, the exclusive or special privilege of charging more than 8 per cent. for money loaned while the general law of the State, by which all other individuals and corporations are controlled, declares

all such contracts usurious and void? See *Goodwin* v. *B. & L. Asso.*, 12 Bush (Ky.) 110, where the negative of that proposition is held to be clearly the law, and see also *Birmingham* v. *McLard & Co.*, 45 Md., 541. Such seems to be the conclusion of this Court in *Simonton* v. *Lanier*, 71 N. C., 498, where, speaking of this constitutional provision, Justice BYNUM said: 'The wisdom and forethought of our ancestors is no where more clearly shown than in providing these fundamental safeguards against partial and class legislation, the insidious and ever working foe of free and equal government.' Whatever may be said upon that subject, this is at least clear: the intent of the Legislature to confer such a privilege upon a claimant must be entirely free from doubt or it will not be allowed—both the grant and the identity of the grantee must clearly appear.

"It was proper, therefore, that His Honor should adjudge that the contract set out in the defendant's answer as that which it claimed the right to enforce by a sale of the plaintiff's land 'was usurious under the laws of North Carolina.' We have declared, for the reasons heretofore set out, that for the purposes of this action it is a North Carolina contract, and that the sum due to the defendant must be ascertained upon an accounting by applying to the disputed items the rules established by the decisions of this Court. One of those rules—that one which has been fixed by a long line of decisions and has been repeatedly approved—is that this Court, looking at the substance of the matter, as bound to do, sees in this whole transaction simply a loan of money by the defendant to the plaintiff. In the account taken by the referee under the directions of His Honor the plaintiff is charged with all he received with 8 per cent. interest thereon. Entrance fees, stock, dues and premium must all go to his credit, for as we view it, all these payments

are but parts of the transaction which we have declared to be merely a borrowing and lending of money at an illegal rate.    If the plaintiff was to be charged with interest at 8 per cent. upon the sum loaned him, he was entitled to like rate upon his payments.    He should not have been charged with any fines, for this defendant as we have said has no right to lay any fines upon its borrower under any circumstances here, and certainly cannot collect fines from the plaintiff because he refused compliance with its illegal demands.    Whatever may be the decisions in other States in this one all these matters are well settled.    Am. & Eng. Enc. of Law, Vol. 2, p. 639, note 1.    We can see no reason for reviewing at this late day what has been so long acquiesced in by all.

"It may not be improper for us to say in this connection that the insertion in such contract, as we now have under consideration, of a stipulation that in no event should the aggregate of all the sums to be paid by the borrower (interest being allowed to his credit) exceed the sum loaned him and interest thereon at 8 per cent. per annum, would perhaps entirely relieve all such transactions from the imputation of being usurious.  The remedy seems easy.  It is insisted with great confidence that the rate which he would be required to pay, if he and his fellow borrowers would carry out their engagements, will be much less than 6 per cent. If that be true, no loss can come to the lender by reason of the incorporation of such a stipulation in the contract.    It would be merely to make that a part of the contract which is in fact an inducement to it, but an inducement put in such shape as to be of no legal effect to protect the borrower from usurious exactions.  The proposition is a simple one.    Let the money lending corporations that, under the guise of building and loan associations, are professing to loan money, in a complicated and somewhat confusing

MERONEY v. LOAN ASSOCIATION.

method at 6 per cent. or less, insert in their contract a binding stipulation to the effect that in no event will they exact more than eight per cent., and all trouble and difficulty will vanish. The courts will be content, for the law against the taking of usury will be obeyed. The borrowing mortgagor will be fully protected against illegal and ruinous exactions, and what has been told him with confidence by the lending mortgagee will be, in a measure, legally secured to him.

"The lending corporation cannot reasonably object, for the limit proposed (8 per cent.) stands far beyond the rate it assures the borrower it will exact. An objection on its part to the insertion of this safeguard for the home builder would but emphasize the necessity for the rigid enforcement of the rule of the Mills case, showing, as it would, that there was some danger that the exigencies of its business might frustrate all its hope and calculations, and bring to the confiding borrower ruin or disaster.

"In *Taylor* vs. *VanBuren Building & Loan*, 56 Ark., 340, such a restriction was in the contract between the borrowing member and that association, and the court held that that stipulation relieved the transaction of all charge of taking illegal interest.

"We have proceeded thus far upon the assumption that the promise of the plaintiff borrower to pay the defendant lender for the use of money 6 per cent. as interest and 6 per cent. as premium, so called, was such a contract as would be enforced in the courts of the State of Georgia if it was solvable in that jurisdiction and made with reference to its laws. The general law of that State makes 7 per cent. the legal rate, but parties may lawfully contract for 8 per cent. Charging interest beyond this limit is illegal. How then it can be lawful for the defendant corporation to charge in that State what is clearly the equivalent of 12

116—58

per cent., to-wit, 6 per cent. interest and 6 per cent. premium?

"We are told that in *Parker* v. *B. & L. Asso.*, 46 Ga., 166, and in *Vanpelt* v. *Asso.*, S. E. R., 501, the Supreme Court of Georgia so declared. An examination of the first mentioned case which is very fully reported enables us to see that the Fulton B. & L. Association was a corporation differing in many respects from the defendant. It seems to have been a true building and loan association as defined by Mr. Endlich. Its contract with Parker was not identical with that of this defendant with this plaintiff. It differs from it in many material respects. Neither Parker nor Vanpelt was charged 6 per cent. interest and 6 per cent. premium on the money advanced to them. We have not been able to find in any of the cases from the Supreme Court of Georgia, to which we have been cited, any adjudication upon a contract exactly similar to the one we have here under consideration. In Parker's case, at page 192, the Court says of the transaction: 'Whether the scheme taken as a whole is or is not a device to avoid the usury laws is a question of fact for the jury under the proof. The Court so charged the jury and the finding is in effect that it was not such a device. We think the jury found rightly upon the evidence.' The evidence in that case was the charter and by-laws of the association and the contract with Parker. *Non constat,* that because it was proper for the jury to find there was no device to evade the usury laws of Georgia in that scheme upon that evidence, it would be necessary for all juries to find that there was no such device in this defendant's scheme as evidenced by its charter, by-laws and contract with the plaintiff. Comity may require that the Courts of this State shall adjudge to a citizen of Georgia, suing here, upon a purely personal contract solvable in that State, a citizen of this State such a sum as by the laws of

Georgia he could there recover on the contract—that the measure of his recovery shall be determined by the *lex loci solutionis* ; but surely comity does not require us to assume, in order to give the foreign plaintiff more than our own citizens in like circumstances could recover, that, because the Courts of that State had declared one scheme of a genuine building and loan association not usurious 'upon its face,' therefore the law of that State was that the very different scheme of a very different corporation is not usurious. A decision of the Supreme Court of Georgia, *Butler* v. *M. A. L. & I. Co.*, 20 S. E. Rep., 101, which has been rendered since the trial and argument of this case, is confirmatory of our view of the law above expressed. In that case, which was an action by the Mutual A. L. & I. Company, of Atlanta, Ga., against Butler to foreclose a mortgage, such as we here have under consideration, the mortgagor among other pleas averred : 'It claims to loan money at 6 per cent. per annum, payable and collectible monthly, but under the name of 'premiums,' which is but another name for usury, collect another 6 per cent. monthly, by such device collecting really 12 per cent. per annum, payable monthly on loans, thus, under fancy names, carefully eschewing the name of 'interest,' which said charges really are, and, with the object and intent to do so, contracting to take and collect a higher rate of interest than is allowed by law.' The lower Court, considering no doubt that the principle established by Parker's case, *supra*, was applicable, overruled this plea and gave judgment for the foreclosure of the mortgage, but on the appeal the Supreme Court says : 'The plaintiff, as indicated by the record, not being a building and loan association, pure and simple, like the one involved in Parker's case, 46 Ga., 166, the object of which was to enable its members to acquire houses and homes by the payment of small sums monthly, but, on the

contrary, being apparently a composite institution, embracing for its objects insurance, loans and investments, the plea of usury should have been entertained for investigation and determination by the jury, under proper instructions from the Court, as to whether the scheme of the institution as a whole embraced usurious measures and designs, and whether the loan to the defendant was infected with usury or not, and, if so, to what extent.' The record here fully shows that the Atlanta Building & Loan Association is, as we have said, 'not a building and loan association pure and simple, like the one involved in Parker's case, 46 Ga., 166,' but is what the highest Court of its own State has well described as a 'composite institution' and therefore not entitled to claim benefit under that decision. Thus is swept away the claim of the defendant corporation that by the *lex loci solutionis* it is allowed to charge and collect on its loans 6 per cent. interest and 6 per cent. 'premium.'

" Our attention has been called to the Act of 1893, Ch. 434, to show that building and loan associations are, as it is said, favorites of our law, and that they are granted special favors by our statute. This is true. And it also seems to be true that our legislature has invited, as it were, foreign associations of that kind to do business in this State under certain prescribed regulations. The Act which thus seems to invite them to come, with the assurance that they shall enjoy privileges and exemptions here not allowed to corporations of other classes, is an amendment to the general law for the incorporating of building and loan associations ( *Code*, Vol. 2, Ch. 7). It is evident that the legislature intended to confine its liberal invitation to those foreign corporations whose powers, purposes and methods corresponded with the powers, purposes and methods of home corporations organized under this general law, and that it

did not intend to thus favor corporations, the scope of whose powers extended far beyond the limits imposed upon domestic corporations by the Act. The powers of a building and loan association organized under our law are very limited. It is a strictly mutual co-operative organization. It cannot borrow money except for specified purposes. It cannot act as a banking institution. It cannot deal in real estate or personal property. It cannot issue bonds. It cannot engage in manufacturing. It cannot act as a trustee or trust company. All these things are *ultra vires*. If its officers engage in them, and loss follows, they are personally liable to the members. They may be enjoined from engaging in them. If the charter of a foreign corporation, called a building and loan association, shows that these businesses and others of like nature are, as to it, *infra vires* then it follows that the privileges and exemptions of the Act cannot be claimed by it. The charter, not the name, determines the class to which it belongs.

" In *Land Corporation* v. *Sec. of State*, 76 Mich., 162, (43 N. W. Rep., 14) there was a petition for a mandamus to compel the defendant to file the articles of association of the relator, a foreign corporation, under an act of that State. The mandamus was denied upon the ground that the relator was not such a corporation as the act contemplated. The Court said : 'The method of organizing, the extent and condition of creating, holding and transferring stock, the authority and constitution of the governing body and the powers and functions of the corporation, and of its constituent members and bodies, are all matters of importance. The Secretary of State based his principle objection to filing these papers on the fact that, instead of being organized for mining and treating metals, those were but partial, and to some extent incidental. But this company, as a corporation already organized under foreign laws for

the multifarious purposes named in its articles, cannot obtain any legal standing by filing its papers under Section 23 of the mining law without the subversion of settled principles.' Our statute contemplates the licensing of corporations organized for a certain single purpose, with certain prescribed methods and powers. One organized under foreign laws for multifarious purposes has no right to the license under the Act. It can depend for the enforcement of its rights in our forums only on the rules of comity.

" We are not forgetful of the earnestness with which it was argued before us that because, as it was said, large sums of money had been loaned in this State by foreign companies upon schemes similar to that one we have here under consideration, and much other foreign capital stands ready for investment within our borders upon like contracts, it was most important that such transactions should not be declared usurious ; and we were told in effect that if our conclusion was as herein declared the foreign lenders would at once proceed to foreclose the mortgages to the great inconvenience of those who had borrowed from them. We cannot change our opinion of the law to suit the exigencies of any occasion. The law applicable to the case in hand and to others of like nature has been, as we think, for a long time clearly settled in this State. In all the legal literature pertaining to the perplexing matters of building and loan associations, so far as we have found, the doctrine of this Court is conceded to be plainly stated and consistently followed. We merely reiterate what our predecessors long ago decided. If under these circumstances the lender gets less hire for his money than he hoped for, the blame, if there be any, must rest on those who have acted in defiance of the decisions of this Court, not upon us who only decline to reverse those decisions. But can harm come to the lender ? Certainly not, unless it is exacting

more than 6 per cent. for the hire of money for that rate it is allowed to collect. How can the borrower be harmed? His mortgage cannot be foreclosed or his lands sold so long as he makes the stipulated monthly or weekly payments set forth in it.

"When these payments, treated as partial payments on the debt, are sufficient to extinguish that indebtedness, the account being taken according to the principle repeatedly announced by this Court, the lien on his property will have been discharged, and the Courts will decree its formal cancellation. We guard him from unreasonable and perhaps ruinous exactions in the future. We do not precipitate upon him any new burden. We merely fix a limit when his burden bearing shall in any event cease; and we fix that limit far beyond the line where the lender says he will wish to go. So, the assurance of safety we give to the borrower works no restraint on the lender, and both should be content.

"When this cause was before this Court on a former appeal, the sole question was whether there was sufficient ground for enjoining the sale of the plaintiff's property till the controversy could be heard and determined on its merits. The record as then presented contained an allegation on the plaintiff's part that the transaction as detailed in the complaint and answer was contrived to evade the usury laws of this State. We did not consider it at all necessary then to discuss the very important matters involved in this controversy, as it no where appeared that they had been passed upon by the Court below. The order then appealed from was not erroneous, we said, for the sufficient, but not necessarily sole reason that there was evidently a 'serious issue' between the parties. We merely declined to reverse an order continuing the injunction in force until the hearing."

So far we have adopted the very able and elaborate opinion prepared for the Court at last Term by Mr. Justice BURWELL, but which was not then filed. A re-argument was had at this Term of this and the cognate case of *Rowland* v. *B. & L. Asso.*, 115 N. C., 825, embracing substantially the same controversy. This is five times the questions involved alike in these two cases have received the fullest and most exhaustive argument before the Court. It must be conceded that we have not acted hastily and that we have had at least opportunity to comprehend the points presented in all their bearings. Counsel for defendant frankly admitted in the argument that their clients began business in this State knowing that the decisions of this Court in the Mills case, which has for 20 years remained undisturbed by the Courts or the Legislature prohibited the mode which they proposed to follow and have followed, but that they came expecting to procure a reversal of that decision. For a party to deliberately and systematically violate the law as it has been announced and continuously recognized by the highest Court of the State for a series of years with the avowed purpose of causing the Court to take back and reverse its decision under the better instruction of such law-breaker, is a proceeding hitherto unknown in this State. The non-resident counsel of the non-resident corporation, who thus admit their deliberate violations of our statutes, used as one of their most persistent arguments to change the views of this Court, that the combined capital of such corporations mounts up into millions of dollars. It is not the first time that accumulated wealth has demanded exclusive favors and privileges, but it has probably never before been so unreservedly asserted in a Court of Justice, in this State at least. Our revolutionary ancestors anticipated the force, the exactions, the indifference to equality of overgrown combinations of capital, and

placed in the Bill of Rights of 1776 the provision against the grant of exclusive privileges, which remains in our present Constitution as a protection to the plain, common people against these excessive claims of money gathering corporations. The opinion of Justice BURWELL, above adopted by us, shows how little claim such institutions as this defendant is shown to be, have to use the beneficient title of building associations and that they are in fact thinly disguised banking associations claiming to be superior to our usury law because chartered elsewhere. Such discrimination if legal would destroy all our home banks, and other like institutions, which faithfully observe the law limiting the rate of interest, and pay their taxes to the support of the State and County Government. Thus freed, if this claim is allowed, from both our taxation and usury laws, the defendant would yet seek to obtain the use of our courts to collect the money which it has secured by mortgage on real estate here. The circumstances would justify sharper criticism than we have so far given to any case before us. The defendant asserts immunity from the restrictions and burdens imposed by law on all others, and at the same time asks the best security given by law and the use of the process of the courts to enforce it. The defendant also called to our attention a bill which it procured to be passed at the last session of the General Assembly, and claims that it protects it in the violation of our usury laws. This statute which is drawn with considerable art, provides in the first section that building and loan associations are restricted to six per cent., which has by a general act of the same legislature been restored as the limitation upon interest. In a subsequent paragraph, the association is allowed to charge cost, expenses, interest, premiums and fines. The controlling idea in the first paragraph restricting these corporations to the six per cent. which is

the general policy of the State must govern, and calling these other exactions premiums, penalties and the like does not make them other than interest, or authorize the exaction of more than six per cent. for the totality. A similar case was *Simonton* v. *Lanier*, 71 N. C., 498. When two constructions of a statute are possible, the Court should adopt that which is most reasonable and in accord with the declared and recognized public policy of the State. It would neither be reasonable nor in accord with our recognized policy nor just to the legislature to construe that they deemed that public opinion and considerations of justice required that the industries of the State should be protected against the exactions of a greater rate than six per cent. for the use of money, and yet that the same legislature provided that combinations of capital might by dubbing themselves building and loan associations and euphoniously styling their exactions of interest premium, fines, penalties and the like, could exact pay for the use of money without limitations. This would be one law for the rich and another for the poor. Could we hold that the legislature intended to so enact (and they certainly did not) the wisdom of the organic law has placed its ban upon such discrimination and special privileges. A penalty or fine for non-payment of money is interest. If money is loaned at six per cent. and five per cent. premium, this is simply 11 per cent. interest. The courts have always said that in usury cases they "look through all disguises to the real nature and truth of the transaction." The shifts and devices of avarice are countless in attempting to evade the protection which the lawmaking power sees fit to erect against its exactions. Calling interest by other names, as premiums, fines and penalties, is a threadbare device and was laid open in very clear language in our leading case of *Mills* v. *B. & L. A.*, twenty years ago. Recurring to the Act of 1895, which

RIDLEY *v.* RAILROAD COMPANY.

the defendant pressed on our notice as an exemption in its favor, it may be noted that if the legislature could be understood as having so intended it to be, thus overriding the first clause thereof and the general statute as well, and if there were no constitutional prohibition against the grant of such exclusive and special privileges, even then the act in question took effect on March 9th, 1895, while the general act prohibiting any one, without exception, to exact more than six per cent. for the loan of money took effect April 13, 1895, and would have the effect of repealing all exceptions and stopping on that date the exaction of a higher rate by the defendant under its prior special act.

Affirmed.

AVERY, J., dissents.