McILWAINE et al. v. ISELEY et al.[1]

(Circuit Court, W. D. North Carolina. August 5, 1899.)

No. 139.

1. CONTRACTS—WHAT LAW GOVERNS.

A building and loan association of Tennessee, doing business in several states, used in all the same form of notes and mortgages, which conformed to the laws of Tennessee, and contained a provision that they were made with reference to such laws. All applications for membership and loans were required to be sent for approval and acceptance to the home office, where all contracts and notes purported to be made and were made pay-

able, though local agencies were established in other states, through whom applications and payments might be made for convenience. *Held,* that a note and mortgage made in conformity to such requirements by a resident of another state could not be construed as an attempt to evade the usury laws of such state, but that the parties must be held to have understood and intended in good faith to make the note and mortgage Tennessee contracts, in so far as it was in their power to do so.

2. FEDERAL COURTS—FOLLOWING STATE DECISIONS—USURY IN MORTGAGE CONTRACTS.
Under the decisions of the supreme court of North Carolina, mortgage contracts relating to lands in that state must be construed with reference to its usury laws, regardless of the expressed intention of the parties, since such contracts are only enforceable by courts within the state. Such decisions further hold that mortgages given to building and loan associations are subject to the same rule as to usury as other mortgages. *Held* that, in a suit in a federal court to foreclose a mortgage given to a building and loan association of another state on land in North Carolina, the court would follow the rule of such decisions, which is in the nature of a rule of property.[1]

This was a suit by the receiver of an insolvent building and loan association to foreclose a mortgage given by a stockholder to such association.

John W. Hinsdale, for plaintiffs.
L. M. Scott, for defendants.

SIMONTON, Circuit Judge. The Covenant Building & Loan Association is a corporation created under the laws of the state of Tennessee. Having become insolvent, it was placed in the hands of the receivers named in the title of this case. Ancillary proceedings were then instituted in this court, and the same receivers were recognized and appointed. These receivers, having in their hands certain notes and mortgages, assets of the association, applied for and obtained leave to foreclose the same in this court. Pursuant to this, this bill of foreclosure was filed. The charter of this insolvent corporation is that of a building and loan association strictly. It expressly declares "that by no inference whatever shall said corporation possess the power to discount notes or bills, deal in gold and silver coin, issue any evidence of debt as currency, buy and sell any agricultural products, deal in merchandise, or engage in any business, outside the purpose of this charter." Its principal place of business is at Knoxville, Tenn. It had authority to establish branch offices elsewhere, and did in fact establish such branch offices in some ten or more states of the Union. The by-laws of the corporation provided that, in establishing these branches, local boards could be appointed to superintend them, subordinate to the home board, and dues, fines, and interest could be paid to the treasurer of the local board. But it was also provided in these by-laws that all money due from the members of the association, and all from it to members, shall be payable at the home office in Knoxville, Tenn., and all contracts and mortgages shall be deemed to be made in Tennessee, and under the laws of Tennessee. Speaking of this by-law,

[1] As to state laws as rules of decision in federal courts, see note to Wilson v. Perrin, 11 C. C. A. 71, and note to Hill v. Hite, 29 C. C. A. 553.

and of the charge that it was adopted to evade the usury laws of the state of North Carolina, two witnesses, officials of the company, say:

"This statement is wholly erroneous and untrue. These provisions were in entire good faith, and are necessary to insure uniformity, equality, and mutuality among members of the association. As the association does business in eleven different states, without this stipulation this equality, uniformity, and mutuality could not be secured."

The by-laws direct the mode in which the loans of the company can be made and secured. Several members of the bar of Tennessee, lawyers of learning and experience, have testified that in this respect the by-laws are strictly in conformity with the laws of that state and the decisions of its court of last resort. The mode is this: Each month, at a meeting of the directors, the money of the corporation is lent to the person bidding the highest premium therefor. Stockholders of the company have the preference in all such cases, but, if there be no stockholders who desire to bid, the money can then be lent to other persons, who may then bid upon it. The loans, in every instance, must be secured by mortgages of real estate. Any person may become a subscriber to the capital stock of the association, making application therefor. The application may be made through a branch office, or directly to the home office. In every instance, the application to a branch office must be forwarded to the home office for consideration and determination. If the application be granted, a certificate of the number of shares allowed is issued to the applicant at the home office; he first paying a membership fee. This certificate, on its face, declares that payments of the subscription must be made monthly, subject to the conditions indorsed on the certificate, that the by-laws are a part of the certificate, and that at the maturity of the stock the owner may draw from the association $100 per share. The conditions, thus indorsed, may be thus summed up: The monthly payment is 60 cents per share,—that is to say, 50 cents on the stock subscription, and 10 cents for general purposes of the corporation,—payments to be made to the home office, or to the local treasurer for transmission to the home office; the local treasurer to be selected by the local board. Failure to pay these monthly installments as they accrue subjects the subscriber to a fine of five cents per share, and, if the default continue for six months, it works a forfeiture of the stock. Shares may be withdrawn and surrendered at any time on terms fixed by the by-laws, but fees paid for membership cannot be repaid. The profits of the company are ascertained every six months, and apportioned among the shares, and, when the aggregate of these profits amounts to $100 per share, that share is deemed to be matured. After holding the stock for a short time, the stockholder has the privilege of borrowing money from the company, by bidding therefor, as stated above. This bidding may be either orally or in writing. He gets the loan if the premium he bids be higher than that of other bidders, or, if it be equal to others, his bid is prior in point of time. The bid being approved, he will get the money upon executing a note or bond promising to pay the sum borrowed on or before a day certain, with interest thereon at 6 per cent. per annum;

also, the premium he bid thereon in the installments agreed upon; also, the monthly dues on his subscription for the stock as they accrue, and all fines incurred under the by-laws. To secure this note, he executes a mortgage of real estate, containing covenants to pay all taxes on the realty accrued and to accrue, and the premiums for keeping the buildings on the land insured to an amount agreed upon. Finally, as further security, he assigns his stock certificate to the corporation as a collateral. At the maturity of the stock, all conditions having been fulfilled, its matured value is taken by the corporation, and applied to the satisfaction of the mortgage. If the borrower fails to fulfill all the conditions, or if the corporation becomes insolvent, before the maturity of the stock, an account is taken, in which interest is calculated on the loan at 6 per cent. per annum, and the borrower is credited with all sums of money paid by way of interest or premium, but with nothing paid on account of the stock subscription or membership fee. The difference is the debt due.

The charter under which this company was organized, the by-laws adopted by it, the method in which its money is lent, the mode by which it is secured, the interest charged thereon, the premiums demanded on the loans, have all been declared valid under the laws of Tennessee, and the decisions of the court of last resort in that state. This is proved by the testimony of several eminent members of the bar of Tennessee, taken in this cause. This association, being a going concern, and having a local board and treasurer in Burlington, N. C., issued to W. C. Iseley and A. A. Iseley a certificate of stock for 20 shares in the company, in the manner and form prescribed as above. The application for the stock, dated January 7, 1893, was made through a soliciting agent of the company, resident in Burlington, was duly forwarded and referred to the officers of the company at the home office in Knoxville, Tenn., and was considered and granted by them. The Iseleys, having subscribed to the stock, for the purpose of getting a loan of money, exercising their privilege as stockholders, made an application for a loan of $1,000. This application was made through the local agent, was forwarded to the home office at Knoxville, was considered, and granted them. It was dated June 14, 1893. W. M. Ashmore, the secretary of the company, testifies to this point as follows: The application was received by the attorney and manager of the loan department, and was by him presented to the board, as the application and bid by the applicants for the priority and preference in securing a loan, along with other applications and biddings for premium, presented at the same time, and was so treated, acted upon, and accepted by them, subject to the approval of the executive committee as to the sufficiency of the security. That committee reported favorably upon this application, and the loan was granted and consummated, and the note and mortgage in controversy executed, on July 1, 1893, though the mortgage bears date June 14, 1893. The note for the loan is headed Knoxville, Tenn., and is dated June 14, 1893. It is for $1,000, and promises to pay to the Covenant Building & Loan Association, the principal, on or before 9 years from date, and a

premium of $5 per month, as well as interest on the $1,000 at the rate of 6 per cent. per annum. It recites that the note is for money borrowed on 20 shares of the 37th series of stock of the company, and that it is secured by a mortgage of even date therewith upon a lot of land in Alamance county, North Carolina. The condition of the note is the prompt payment of the interest on the $1,000 monthly, of the monthly installments of premium on the loan bid by the makers, of the monthly payments upon the subscription to the stock, and all fines assessed by the association, of the taxes accruing on the land, and all premiums necessary to keep up an insurance of $1,300 on the house on this land, until the stock becomes fully paid, of the value of $100 per share. Then, upon the surrender of 10 out of the 20 shares of the stock, the note will be fully paid and canceled. The failure to fulfill each and every of these conditions for a period of six months gives the option to the corporation to declare the whole indebtedness at once due and payable, and gives the right to foreclose the mortgage. The note, which is for the most part in print, concludes with these words, printed: "It is further understood that this note is made with reference to and under the laws of Tennessee." It is signed by each of the Iseleys and by Mrs. Lena Hall Iseley, and is under seal. Contemporaneous in date with the note, the mortgage is executed of the lot of land in Alamance county, reciting the same conditions as the note, which is fully set out. In case of a breach, power is given to the corporation mortgagee to foreclose and sell the land. The mortgage is said to be made June 14, 1893. The certificate of the probate of the deed and of the separate examination of Mrs. Lena Hall Iseley is dated June 26, 1893. The deed was filed for registration June 26, 1893. As has been seen, the loan was granted July 1, 1893. The Iseleys fulfilled the conditions of the note until May, 1897. Up to that time, they had paid monthly installments of premiums, $215; monthly payments of interest, $215,—$430; monthly payments on stock, $564. They had failed to pay a premium for insurance for $21.25. Not crediting on the loan any part of the $564 paid on the stock, the complainants claim that there is now due on the loan $717.16, and interest on $686.72 from March 1, 1898. In the meantime, the Covenant Building & Loan Association had become insolvent. Proceedings were instituted in the circuit court of the United States for the Northern division of the Eastern district of Tennessee, and on February 22, 1893, by the order and decree of that court, the receivers in this cause received their appointment, and subsequently, as has been stated, by ancillary proceedings in this court, they were recognized and appointed receivers in this jurisdiction. This bill for foreclosure having been filed against W. C. Iseley, A. A. Iseley, and Mrs. Lena Hall Iseley, the first and last named answer. A. A. Iseley is dead. They admit the main facts of the subscription to the stock, and the loan, the execution of the note, and of the mortgage. They do not admit that the note states that it was made under and with reference to the laws of Tennessee; denying any knowledge on this point. The note in evidence, however, has this provision on its face. Mrs. Iseley signed the note, and joined in the execution of the mortgage,

in order to pass her dower in the land owned in part by her husband, W. C. Iseley. Their line of defense is this: The note and mortgage were made and executed in the town of Burlington, N. C. That in that town the association had a local board and a local treasurer, with whom they dealt, and to whom they made payments. That so the contract was a North Carolina contract, governed by the laws of that state. That the provisions in the contract that dues, interest, and premiums should be paid at the home office in Tennessee were inserted to give color to the idea that this was a Tennessee contract, while in fact it was not, and in order to evade the usury laws of North Carolina. They also aver that they did not subscribe to the stock as an investment, but solely for the purpose of obtaining a loan. That this subscription and the loan were all parts of one transaction; the subscription having been made upon and because of the promise of the local agent that the association would lend them the money. There can be no question that under the laws of Tennessee this would be a valid contract, not tainted with usury. McCauley v. Association, 97 Tenn. 421, 37 S. W. 212; Post v. Association, 97 Tenn. 408, 37 S. W. 216; Hughes v. Association (Tenn. Ch. App.) 46 S. W. 362. But, this association being insolvent, the same mode of settlement would be adopted in Tennessee, whether the contract be usurious or not. Rogers v. Hargo, 92 Tenn. 35, 20 S. W. 430; Post v. Association, 97 Tenn. 408, 37 S. W. 216; Clark, J., in Lamar v. Association (exhibit to the bill in this case). There is equally no question that, by a current of decisions in North Carolina, a contract like this would be held to be tainted with usury. Meroney v. Association, 116 N. C. 882, 21 S. E. 924, and cases cited. If it be a Tennessee contract, then the rule laid down by Judge Clark in the case cited supra will be followed. The debtor will be charged with the amount loaned, and with interest at 6 per cent. thereon from the date thereof. He will be credited with all sums paid by way of interest on the loan and by way of premium, on the principle of partial payments. He will not be credited with monthly payments of subscription on his stock, nor with his membership fee. If it be a North Carolina contract, the debtor will be charged with the sum lent, and with interest thereon from the date of the loan. He will be credited, on the principle of partial payments, with all sums paid,—as for interest, installments of premium, and monthly installments of subscription on the stock used in getting the loan.

This, then, is the decisive question in the case: Must this court, in enforcing this contract, follow the mode of settlement provided by the laws of Tennessee, or that provided by the law of North Carolina? The papers in the case, which were signed by the defendants, were prepared for and were signed by them in North Carolina. These papers were, if we may so speak, the inducement to the contract. The application for subscription to the stock and the proposal for the loan were presented by the defendants, and by them were placed in the hands of the local agent at Burlington, N. C. But of themselves they did not constitute a contract. They were to be forwarded to the directors of the corporation at Knoxville, Tenn., to be considered by them, and to be submitted for their acceptance.

They were so forwarded and submitted. With them were also submitted the note for the loan, duly signed and sealed, and the mortgage of the land in North Carolina, framed and executed, recorded and perfected, in accordance with the laws of North Carolina in that behalf prescribed. These two complete instruments were forwarded with the proposal for the loan in escrow, and were submitted with this proposal. The proposal was accepted, and the note and mortgage were approved. This acceptance and approval were the consummation of the contract, and thenceforward it was the contract of the parties. So the contract was in fact made and completed at Knoxville, Tenn. 7 Am. & Eng. Enc. Law, 136. Shattuck v. Insurance Co., 4 Cliff. 598, Fed. Cas. No. 12,715. The note tendered and accepted gives the contract in detail, and is made to bear date as of Knoxville, Tenn. By this contract, all dues are payable at Knoxville, Tenn. Thus the association had the right to require the payments to be made at that place, notwithstanding that, for the sake of convenience, the payments could be made through the local treasurer. Were we left to inference only on this point, it could reasonably be inferred that the parties contracted with reference to the laws of Tennessee. Bigelow v. Burnham (Iowa) 49 N. W. 104; Healy v. Gorman, 15 N. J. Law, 328. But we are not left to inference only. The note itself expressly declares that it "is made with reference to and under the laws of the state of Tennessee." Parties competent to contract are presumed to know the meaning of their own acts. In the absence of evidence tending to show fraud, misrepresentation, or duress, it may safely be concluded that the parties understand and mean what they say. The defendants' reply to this is that all this is delusive, intended to cover usury, and to defeat the laws of North Carolina. The agents of the corporation deny this in toto. They show that the form of the contract is the one adopted and in use without change in the state of Tennessee, and in all the many other states in which the corporation did business; that it was adopted so as to have one uniform standard in the construction of their contracts, and to secure equality, uniformity, and mutuality among all the members of the association, from which class the borrowers come. If there were collusion to evade the law of North Carolina, it must have been with the concurrence of defendants. Does this recommend their effort to defeat the express language of their contract in a court of conscience? The conclusion seems clear that, when this contract was made, the parties to it understood and intended that, so far as in them lay, it should be construed as a Tennessee contract. But this does not free the case from difficulty. This note was secured by a mortgage of lands in North Carolina. This mortgage would be incomplete and inoperative, unless it was made, executed, and recorded in accordance with the provisions of the statute of North Carolina. In this suit for foreclosure the mortgage is the gist of the action. Does this give to the law of North Carolina the control in the enforcement of the mortgage contract? Upon this question there is great diversity of opinion among text writers, and a difference of decision in the reported cases. The very learned counsel for com-

plainants, in his complete and exhaustive brief, has arrayed a vast number of authorities sustaining that position of Judge Story that the fact that the loan is secured by a mortgage of lands in a country other than that of the contract will make no difference. Story, Confl. Laws, § 293. On the other hand, the supreme court of North Carolina, in a very able opinion in Meroney v. Association, 116 N. C., at page 891 et seq., 21 S. E. 927, take the opposite view, and adopt the test applied by Wharton in his Conflict of Laws (section 507), as follows:

"The true test is, was the mortgage merely a collateral security, the money being employed in another state, and under another law, or was the money employed on the land for which the mortgage was given? If the former be the case, then the law of the place where the money was actually used, and not that of the mortgage, applies. If the latter, then the law of the place where the mortgage was situate must prevail."

The rule laid down in this Case of Meroney, affirmed and reiterated in Rowland v. Association, 116 N. C. 878, 22 S. E. 8, on rehearing, seems to be this: Whatever may be the apparent intent of the parties, if the loan be secured by a mortgage of lands in North Carolina, ipso facto it is a North Carolina contract, and in the enforcement of the mortgage, and in applying the remedy thereunder, the court will be governed by the laws of the state of North Carolina. If the contract which the mortgage was intended to secure be usurious under the laws of that state, it will not permit the mortgage to be used to secure it in its entirety, but only to the same extent as the laws of North Carolina would apply it in the cases of usurious contracts. The principle upon which this proceeds seems to be this: It is impossible to enforce this contract, secured by a mortgage of lands in North Carolina, except on application to, and in accordance with, the laws of North Carolina, by foreclosing the mortgage. Therefore, the law of North Carolina must be applied before the remedy can be had. Jackson v. Mortgage Co. (Ga.) 15 S. E. 812; Pine v. Smith, 11 Gray, 38; Thompson v. Edwards, 85 Ind. 414; Pancoast v. Insurance Co., 79 Ind. 172; Falls v. Building Co. (Ala.) 13 South. 25. In Rowland v. Association, 115 N. C. 830, 18 S. E. 965 (a case reheard and reaffirmed in 116 N. C. 877, 22 S. E. 8), the court declare that a bargain like the one at bar could not be enforced in North Carolina by the foreclosure of a mortgage, because it is unconscionable; maintaining, evidently, that when a suitor seeks the aid of the court in North Carolina in enforcing his contract, that court has a discretion in granting the remedy, and in directing how it shall be applied. Both of these cases deny that building and loan associations stand upon a different footing from other lenders of money. With them, as with all other lenders, every device by which it is sought to obtain for the use of money a greater rate than that fixed by law is tainted with usury. In this conflict of persuasive authority, and in the absence of any decision of the supreme court of the United States, this court in this case will follow the courts of North Carolina. There is no federal question involved. The jurisdiction of this court attaches because of a diversity of citizenship. The issue relates to realty situate in the state of North Carolina. The

sue relates to realty situate in the state of North Carolina. The rules laid down by the courts of that state as to the enforcement of mortgages of realty therein are very much in the nature of rules of property. A conflict of decision upon a matter of local law between the state and the federal courts should always be avoided, if possible. If a doubt exists, that doubt should be solved in favor of the decisions of the state court. The contract in this case must be treated as a North Carolina contract, and the decree will accord with the decisions of that state thereon.

By the terms of the note, it is clear that the defendants used 10 of their shares for borrowing purposes, and that 10 were considered as an investment. The note was to be surrendered and satisfied upon the surrender of 10 shares. Let an account be stated, in which the complainants will be credited with the sum lent, and with interest thereon from the date of the loan, at the rate of 6 per cent. per annum, and also with all sums paid by way of taxes or premiums for insurance, with interest from date of said payments. In this account let there be charged against complainants all sums paid by way of interest, installments of premium, and subscription upon 10 shares of stock, upon the principle of partial payments, and no more. The costs of the case to be paid by defendants.